THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS HEALY, Defendant-Appellant.

First District (5th Division)   No. 86—0802

Opinion filed March 25, 1988.

Julius Lucius Echeles and Frederick F. Cohn, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., James E. Fitzgerald, and Mark F. Smolens, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LORENZ delivered the opinion of the court:

In a jury trial defendant Thomas Healy was convicted of murder and received a 25-year prison term. On appeal he contends: (1) his indictment was based on perjured testimony and was obtained in derogation of his right to a preliminary hearing; (2) the trial court erroneously refused to instruct the jury on voluntary manslaughter; (3) the trial court erred when it limited defense cross-examination of a pathologist and barred the defense from introducing the exculpatory out-of-court statement of an unavailable witness; (4) the prosecution was erroneously permitted to present extensive and detailed testimony concerning defendant's flight from prosecution; (5) the prejudicial effect of certain life-and-death testimony and photographs of the deceased outweighed the probative value of that evidence and thus required its exclusion; (6) the prosecution improperly commented on defendant's failure to testify and his failure to produce a witness; (7) the trial court erred when, in response to a note from the jury, it paraphrased certain instructions for them.

We reverse defendant's conviction and remand for a new trial, finding that the jury should have been instructed on voluntary manslaughter.

The pertinent trial evidence was as follows. Three eyewitnesses testified concerning the confrontation between defendant and the deceased, James Barry, which occurred at about 8 p.m. on March 27, 1981 in Orland Park. None of these witnesses saw the start of this confrontation. As they drove into the parking lot of the Charley Horse Restaurant, all three witnesses saw the two men struggling with each other near the entrance to that establishment.

Daniel Ryskamp described what he saw as a "fight" between two men, subsequently identified by other witnesses as the defendant and the deceased, James Barry. According to Ryskamp the defendant was about 6 feet 1 inch or 6 feet 2 inches in height and weighed 190 pounds. Barry was about 5 feet 9 inches in height and weighed 160 pounds. After "a little bit of a struggle," defendant punched Barry in the head. Barry fell to all fours. Defendant looked at a third person, who was off to the side, then reached into his coat and pulled his hand back out. Barry struggled back to his feet. The two men grabbed each other by their coats and were struggling. Ryskamp lost sight of the men for a few seconds while the car in which he was riding circled the parking lot. He then saw the men by the parking lot entrance. They were still struggling "like in a hockey fight." He then saw Barry slump to the ground and heard a sigh. Defendant looked at

the third man, smiled, and walked away with that man. Barry remained on the ground, unconscious and bleeding.

Ken Friedman testified that he saw the two men fighting and a third man observing. He stated that the two men were pushing and shoving each other. After he parked the car he saw Barry on the ground and the defendant and the third man walking away.

Curtis Surber described what he saw as a "scuffle." The two men were holding on to each other, but defendant was pushing Barry and seemed to have control of him. As the car approached the men, defendant pulled Barry back. They then "started back up." After the car was parked Surber saw defendant standing over Barry, with the third man behind him. The two men then turned and walked away.

Ken Friedman followed the defendant to the vicinity of a nearby department store, where he lost sight of him. After briefly searching inside the store he came out and saw the defendant. He halted a squad car and pointed out the defendant as one of those who had been fighting. When the police officer observed that defendant's right hand was covered with blood he arrested him. Several hours later the police found a knife about 30 feet from where defendant was arrested.

At the Orland Park police station defendant was found to have sustained a cut on his right hand. The officer who observed this also testified that defendant appeared to be partially intoxicated. Paramedics were summoned to treat the cut and they recommended having a stitch put in if the bleeding persisted. Defendant was then transported to the hospital for treatment of the cut. The nurse who treated him there testified that he told her he had cut himself on a knife.

James Barry was pronounced dead at the hospital that evening. The examining pathologist testified that he had three contusions on his upper lip, two stab wounds to his chest, and one stab wound to his abdomen. The multiple stab wounds caused his death. The pathologist also testified that the knife recovered by the police was consistent with an instrument that could have caused Barry's fatal injuries. Barry had an alcohol content of .125 in his blood.

No evidence was presented at trial concerning how the altercation between defendant and the deceased began. There was evidence that both men had been drinking at the Charley Horse bar prior to this incident, but defendant was with his companion, Michael Werli, and Barry was with his friend, Thomas Eberhard. Eberhard testified that the two men did not know each other and did not speak to each other at the bar. According to Eberhard, Barry excused himself to go to the

men's room, which was close to the entrance of the restaurant. Shortly thereafter defendant left with Werli, whom defendant had to assist in walking. The Charley Horse bartender had testified that Werli was intoxicated and defendant appeared to have been drinking when they first arrived at the bar. When Barry did not return after 45 minutes Eberhard went outside to look for him. There he saw the ambulance which he subsequently learned had Barry inside.

Defendant's wife testified that at about 6:30 p.m. defendant called her and asked her to come to the Charley Horse. At 8:45 p.m. Werli called and asked her to pick him up there. When she arrived she saw the police arrest Werli as he stepped out of defendant's van. Werli pointed to his face, which was red and had marks on the right side. The trial court barred as hearsay her testimony that upon his arrest Werli stated, "We were jumped." Werli did not testify at trial. Other defense testimony indicated that the marks seen on Werli's face were not there earlier in the day.

OPINION

(1)

■ We find no merit to defendant's contention that charges against him were brought in an improper manner. It is well established that a defendant has no right to a preliminary hearing where the State instead obtains a grand jury indictment. (*People v. Howell* (1975), 60 Ill. 2d 117, 324 N.E.2d 403; *People v. Smith* (1983), 115 Ill. App. 3d 453, 450 N.E.2d 1242.) Defendant also contends that his indictment was obtained through perjury. He bases this assertion on the grand jury testimony of Officer Dowling, who was apparently the only witness before that body. Dowling testified that one of the eyewitnesses, Daniel Ryskamp, told him that he had seen the defendant take something from his pocket and lunge at James Barry, causing Barry to fall to the ground. Noting that Ryskamp did not so testify at trial, defendant asserts that Dowling's testimony must have been perjury. Defendant waived this issue by failing to raise it in the trial court. (*People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223.) We would note in any event that defendant has failed to establish that Dowling's grand jury testimony was untrue. At trial Ryskamp was not asked whether he ever made such a statement, nor did defendant question Officer Dowling, who was a defense witness at trial, concerning this issue.

(2)

■ We next consider defendant's contention that the trial court erred in refusing to instruct the jury on voluntary manslaughter. As the State concedes, mutual combat is recognized in Illinois as adequate provocation, sufficient to reduce a homicide to voluntary manslaughter. (*People v. Leonard* (1980), 83 Ill. 2d 411, 415 N.E.2d 358.) Where there is evidence which, if believed by a jury, would reduce a crime to manslaughter, a manslaughter instruction tendered by the defendant must be given. *People v. Handley* (1972), 51 Ill. 2d 229, 282 N.E.2d 131.

■ In this cause the trial court refused the voluntary manslaughter instruction proffered by defendant. The court found that because there was no evidence of how the fight started, it could not conclude that the parties had willingly entered into a fight. But our supreme court has approved such an instruction even where the defendant was the initial aggressor and was the one who brought the homicide weapon into the altercation. (*People v. Leonard* (1980), 83 Ill. 2d 411, 415 N.E.2d 358.) Here there was no direct evidence that defendant was the initial aggressor or that he possessed and first introduced the knife into the fight. Yet in effect the trial court made these inferences when it denied the instruction. By doing so it deprived the defendant of the opportunity to suggest different inferences to be derived from the following trial evidence. There was evidence at trial that both men were intoxicated and testimony of State witnesses tended to establish that both men were pushing and shoving each other. This court has recognized that intoxication of the parties engaged in combat may contribute to a finding of voluntary manslaughter. (*People v. Dare* (1986), 140 Ill. App. 3d 413, 488 N.E.2d 1304.) Even after Barry was knocked to the ground he got back up and he and the defendant resumed their struggle. No witness actually saw defendant draw a knife, and defendant himself received a cut on his right hand. Other evidence suggesting an attack by Barry was the testimony concerning a bruise on the face of defendant's companion.

The cases cited by the State are clearly distinguishable on their facts. The State contends that the provocation here was not sufficient, citing *People v. Neal* (1983), 112 Ill. App. 3d 964, 446 N.E.2d 270. But in *Neal* the defendant engaged in an oral argument with his wife, loaded a gun, and shot her. There was no physical struggle at all. The State also contends that the retaliation by defendant was not proportionate to the provocation, citing *People v. Matthews* (1974), 21 Ill. App. 3d 249, 314 N.E.2d 15. But in *Matthews* the defendant's claim was that he argued about money with the decedent and shot

him when he yelled and waved his hand in his face. Again there was no physical confrontation as there was in this case, nor was there evidence that the decedent may have initiated deadly force, as defendant's cut hand suggests in this cause. The State also cites *People v. Cox* (1984), 121 Ill. App. 3d 118, 459 N.E.2d 269, for the proposition that a defendant cannot claim voluntary manslaughter when he initiates combat and then injects deadly force into the situation. In *Cox* the defendant took a gun to the home of her estranged live-in companion, broke in to find him with another woman, and after a verbal argument which included a verbal threat by him, shot and killed him. In this cause we have noted that no direct evidence established who started this fight or who injected the knife into it. There was evidence from which the defendant could have argued that the combat was mutually entered into. The knife cut sustained by the defendant could also support the argument that the decedent introduced that weapon into the fray, and the bruise sustained by defendant's companion constituted some evidence that Barry struck some blows earlier in the confrontation.

Clearly there was conflicting evidence concerning the circumstances of this confrontation. But given that conflict, the jury as the trier of fact should have been permitted to decide whether this homicide was murder or manslaughter. (*People v. Fields* (1978), 65 Ill. App. 3d 278, 382 N.E.2d 337.) Because the jury was not so instructed, we must reverse defendant's conviction. Because of our disposition of this issue, we need not reach the remainder of defendant's issues on appeal.

Accordingly, for the reasons set forth in this opinion, defendant's conviction is reversed and the cause remanded for a new trial.

Reversed and remanded.

SULLIVAN and MURRAY, JJ., concur.