THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL W. JOHNSON, Defendant-Appellant.

First District (4th Division)   No. 1—89—1898

———

Opinion filed May 2, 1991.—Rehearing denied July 26, 1991.

714

Joseph L. Fogel and David C. Bohan, both of Jenner & Block, of Chicago, for appellant.

John O'Malley, State's Attorney, of Chicago (Bonnie Meyer Sloan, Special Assistant State's Attorney, and Renee G. Goldfarb, Assistant State's Attorney, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

After a jury trial, defendant, Daniel W. Johnson, was found guilty of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9–1). Defendant was sentenced to a term of 80 years' incarceration in the Illinois Department of Corrections.

The following issues are before this court for review: (1) whether the trial court abused its discretion by denying defendant's challenges of four jurors for cause; (2) whether the trial court abused its discretion by refusing to charge the jury with defendant's proposed jury instructions; (3) whether the trial court abused its discretion by denying defendant's pretrial motions *in limine*; (4) whether the cumulative effect of the trial court's errors deprived defendant of a fair trial.

We reverse and remand.

BACKGROUND

On Sunday, November 21, 1987, defendant was arrested for the stabbing and subsequent death of Charles "Chuck" Meyer. Defendant was charged with two counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1), and one count each of armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—1) and concealment of a homicidal death (Ill. Rev. Stat. 1987, ch. 38, par. 9—3.1). The People tried defendant for one count of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1). All of the other charges were nol-prossed.

Prior to the trial, the trial court conducted *voir dire* of several veniremen. One of the veniremen was Mr. Michael Milkovich. Mr. Milkovich told the court that his family had been victims of a robbery committed by his cousin, and that his sister was involved in an armed robbery. When asked by the trial court whether those incidents would affect his ability to be an impartial juror, Mr. Milkovich answered, "I hope not." Mr. Milkovich added, "You[ ] know, *** my sister was involved in armed robbery, in robbery, [and] drugs in Hammond." Defendant challenged Mr. Milkovich for cause, but the trial court rejected the challenge.

The trial court also questioned Mr. Richard Welch. Mr. Welch testified that he and his close friends and relatives had all been the victims of violent crimes. Mr. Welch also stated that he had been robbed at knife point, that his mother had been struck by a hit-and-run driver, that his friends had been burglarized, and that one of his friends had been beaten by an assailant. The trial court asked Mr. Welch if the crimes inflicted upon him, his family, and his friends would affect his ability to be a fair and impartial juror. Mr. Welch responded, "Not really." Defendant challenged Mr. Welch for cause on the grounds that his friends and members of his family had been the victims of violent crimes. The trial court denied defendant's challenge.

Another venireman, Mr. Raymond Swope, testified during *voir dire* that he had been robbed, that his car had been stolen, and that both his wife and his mother had been raped. Mr. Swope further testified that while he was working in a mental institution, one of his patients confessed to him that he had murdered an elderly woman. When the trial court asked Mr. Swope whether those incidents would affect his ability to be a fair and impartial juror, Mr. Swope hesitated and replied, "I don't think so." Defendant responded by challenging Mr. Swope for cause. Defendant argued that Mr. Swope's hesitancy in stating that he could be impartial rendered his ability to be fair and impartial suspect. The trial court denied defendant's challenge.

Defendant also challenged Ms. Katherine Dollear for cause. Ms. Dollear was a probation officer who worked in the same building where defendant was being tried. Defendant challenged Ms. Dollear for cause on the basis that her intimacy with the criminal justice system, and, more specifically, that the administration of criminal justice in the criminal court facility rendered her less able to be an impartial juror. The trial court denied defendant's challenge of Ms. Dollear. The trial judge reasoned: "There's nothing I know of that would disqualify her for cause." Defendant exercised his final peremptory challenge against Ms. Dollear.

Prior to the trial, defendant also filed two motions *in limine*. Defendant filed a motion *in limine* seeking to preclude the People from eliciting testimony concerning a small specimen of semen obtained from the victim's mouth during the coroner's examination of the victim's body. Defendant made this motion on the grounds that the People could not produce any evidence, scientific or otherwise, linking the trace of semen to defendant, and that any testimony concerning the specimen was irrelevant with respect to the issue of whether defendant was guilty of murder. Defendant argued in the alternative that even if the evidence was relevant, its probative value was outweighed by its potential to unfairly prejudice defendant. The People argued that such circumstantial evidence was relevant to defendant's identity and motive, and that such information would be relevant if the act was committed by a homosexual. The trial court denied defendant's motion and later admitted the evidence over defendant's objection.

Defendant also filed a motion *in limine* seeking to preclude the People from offering the testimony of a juvenile named James McNamara. The State informed the court that it intended to call James McNamara to testify that defendant had once confessed a desire to "torture" and "kill" someone, and that defendant told him that defendant and the victim were bisexuals. Defendant maintained that James McNamara's testimony would be irrelevant and that it constituted inadmissible character evidence. Defendant also argued that evidence of his alleged bisexuality was immaterial and highly inflammatory. The trial court denied defendant's motion and later allowed James McNamara to testify with respect to these subjects. The court found that such statements made two days before the decedent was found were relevant.

Several witnesses testified for the People, including James McNamara, Ms. Sandra Hernandez, Mr. Alan Johnson, Ms. Debbie Johnson, Officer Michael Alexander, Officer William Barron, Mr. Emory

Cox, Dr. Barry Lifschultz, Mr. Mark Baldwin, Mr. James Houlihan, and Mr. Rodney Anderson. When James McNamara testified at trial, he stated that he observed defendant and the victim together in September of 1987. James testified that on the night of October 31, 1987, defendant told him that "he could put boiling water on somebody's stomach[,]" and that defendant and the victim were bisexuals.

Ms. Sandra Hernandez testified that she often rode in defendant's car, and that while riding in his car, she observed a dark pink blanket. She also stated that every time she saw defendant, he was carrying two or more knives.

Ms. Hernandez also testified that she, the victim, who was her boyfriend, and defendant went to Jacksonville, Florida, in November of 1987. Their trip lasted from November 13 through November 17, 1987. Ms. Hernandez testified that during the trip, defendant and the victim were often together, and it appeared that defendant and the victim wanted time together without her. She also testified that defendant made sexual advances toward her in front of the victim, whereupon the two men had an argument and began to wrestle with each other.

Later, Mr. Alan Johnson testified for the People. Mr. Johnson was defendant's neighbor, and he leased a mobile home to defendant. Mr. Johnson stated that on November 19, 1987, defendant asked to borrow his handcuffs. Mr. Johnson also testified that defendant told him that "he wanted to get this guy drunk, get him high, handcuff him and then hold a knife to his throat *** to teach him a lesson." Mr. Johnson further testified that defendant said that "he wanted him to admit why he had done wrong and then kill him *** strangle him so there wouldn't be any blood."

Mr. Johnson stated that on November 21, 1987, he was awakened at 6:30 a.m. by a telephone call from defendant. Mr. Johnson stated that defendant made the following statement during their telephone conversation: " 'Al, I screwed up. I got blood all over the place. I need to know if your lawn mower work[s] ***. I need to cut the grass.' "

Mr. Johnson also testified that later, around 8 a.m., he observed defendant cleaning the back of his car, and that there was a bucket in the driveway which appeared to contain blood. Mr. Johnson also stated that he saw some cushions from the trailer which defendant was renting lying outside. Mr. Johnson testified that when he asked defendant what happened, defendant told him that the victim "lunged" at him, and that he could not stop stabbing the victim. Then, Mr. Johnson stated that defendant told him that he was think-

ing about keeping a pair of trousers because he thought they might fit, but defendant changed his mind and said, "[N]o. I better not. I better burn them." Mr. Johnson then told the court that he asked defendant whose pants they were and defendant said, " '[T]hey were Chuck's.' " Mr. Johnson then stated that he asked defendant, "You killed Chuck?" and defendant answered, " 'Yes, I did.' " Mr. Johnson then told the court that he ignited a fire in the fire pit and he watched defendant burn the trousers. He also testified that he used his lawn mower to cut his grass over the blood spots on the lawn in order to "conceal that there was blood on the lawn."

Mr. Johnson's wife, Debbie Johnson, testified that she went outside on that same morning to find her sons who were playing in the yard. At that time, she saw defendant, and defendant told her that he had cleaned his trailer and that he wanted to return her bucket. Around 10 a.m., Mrs. Johnson saw defendant and offered him a bottle of beer. Defendant was unable to open the bottle of beer. Defendant told Mrs. Johnson that his hands were lacerated, bruised, and swollen because he was injured while working. Mrs. Johnson told the court that while she was opening the beer bottle for defendant, defendant told her that he had killed someone. Defendant told Mrs. Johnson that the victim started the fight. Mrs. Johnson further testified that around 4:15 or 4:30 p.m., defendant told her that if the police questioned her, she should tell the police that he spent Friday night with her and her husband at their home.

The victim's body was discovered on November 21, 1987. Markham police officer Michael Alexander discovered the body of a partially clothed man at 7 a.m. in the Lone Tree Park. The body was covered with a pink blanket. There was a gag in the victim's mouth, and his throat was cut. Officer Alexander alerted the police detectives and summoned evidence technicians.

Markham police officer William Barron then arrived at Lone Tree Park and copied the decedent's fingerprints, and checked the missing persons records. However, Officer Barron was unable to identify the body.

Later that day, Mr. Emory Cox, a police investigator, visited the scene of the crime. Mr. Cox photographed the body, which was covered by a dark pink blanket, and searched the area for physical evidence. Mr. Cox then removed the blanket from the decedent and observed that he was nude from the waist down. He also observed numerous abrasions on the decedent's head and face, in addition to stab wounds in the decedent's neck, near his nipple, and on the left side of the upper abdomen. When Mr. Cox turned the victim over, he

observed numerous stab wounds on the decedent's back and abrasions and bruises on his left wrist.

The court also heard the testimony of Dr. Barry Lifschultz, a certified forensic pathologist. Dr. Lifschultz observed that two of the decedent's top front teeth were chipped, and that there were 11 stab wounds in the back of the body. Five of those wounds penetrated the chest cavity and two penetrated the heart. Dr. Lifschultz also observed a single wound on the front of the body which penetrated the heart, and a single wound across the front of the victim's neck which penetrated the larynx. The victim's clothing had multiple holes which were consistent with the wounds on the decedent's body. Dr. Lifschultz testified that there were also 28 bruises or abrasions on the body. The abrasions and dirt on the victim's heel were indicative of the body having been dragged on the ground. Dr. Lifschultz testified that the patterned bruises on the victim's wrist were "consistent with handcuff injury." Dr. Lifschultz concluded that the victim died of multiple stab wounds.

During the autopsy, Dr. Lifschultz took a tissue sample from the victim's mouth on a cotton swab. This specimen was analyzed by Dr. Rodney Anderson, a licensed forensic serologist. Dr. Anderson testified that the specimen obtained from the victim's mouth contained a trace of semen. However, on cross-examination, Dr. Anderson admitted that he did not conduct any tests to link the semen found in the victim's mouth to defendant.

Officer Barron and Markham police sergeant Henry Wilson observed the autopsy of the victim's body. During the autopsy, the officers learned that someone possibly connected to the case had arrived at the Markham police station. The officers left the autopsy and returned to the police station. When they arrived, they met defendant, and defendant agreed to speak to them in an office.

Defendant told the officers that he picked up the victim in Midlothian, Illinois, and dropped him off at a cross-walk in Markham, Illinois, so that the victim could purchase some marijuana. Defendant then asked the officers if the victim was in custody. Defendant then gave the officers a description of the victim, and they showed him a picture of the victim in the morgue. Defendant said that he did not recognize the victim in the picture. Defendant gave the officers his home address and telephone number, and he left the police station.

At 3:30 p.m. on that same day, defendant returned to the police station, where he inquired as to whether the body had been identified and whether there were any suspects. Officer Barron told defendant that the police department had no leads. Sergeant Wilson asked Offi-

cer Barron to tell him the color of the blanket which was wrapped around the victim. Defendant answered the question before Officer Barron could speak; he stated that the blanket was pink. Officer Barron then observed that defendant's hands were swollen and scratched. Both officers excused themselves from the room, whereupon Officer Barron told Sergeant Wilson that the fact that the body was covered and the color of the blanket had purposefully been withheld from the public. Both officers became suspicious. The officers returned to the room where defendant was sitting and asked him what means of transportation he used to get to the police station. Defendant related that he arrived at the station in his car. Officer Barron then went outside and looked at defendant's vehicle. He noticed traces of blood on the bumper of the automobile, and dark colored spots on the carpeting in the car. Officer Barron testified that upon returning to the office, Sergeant Wilson advised defendant of his constitutional rights and took him into custody.

Later, Mr. Cox searched defendant's car. Mr. Cox testified that he observed an odor of blood, and bloodstains on the carpeting of the car. On November 23, 1987, Detective Mark Baldwin searched Mr. and Mrs. Johnson's home and defendant's trailer. Detective Baldwin also found the victim's wallet, identification, and a knife in a garbage heap in the Fitzmor Landfill.

On December 30, 1987, a Cook County grand jury indicted defendant for first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1), concealment of a homicide (Ill. Rev. Stat. 1987, ch. 38, par. 9—3.1), and armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—1).

At the close of the evidence, the trial court held an instruction conference before submitting instructions to the jury. During the conference, defendant proposed three Illinois Pattern Jury Instructions, two concerning second degree murder and one concerning the manner in which the jury should view the testimony of Mr. Alan Johnson. Defendant proposed the second degree murder instruction (Illinois Pattern Jury Instructions, Criminal, No. 7.04A (2d ed. Supp. 1987) (hereinafter IPI Criminal 2d)), because there was evidence that defendant and the victim had a fight, the victim lunged at defendant, and the pattern nature of the wounds, which was consistent with second degree murder which is a killing that was provoked by a sudden and intense passion.

The trial court considered the aforementioned evidence and refused to instruct the jury on second degree murder on the grounds that there was insufficient evidence to warrant the requested instructions. Specifically, the court found that the evidence was insufficient

for a jury to find that the killing was provoked by a sudden and intense passion. The trial court also noted that the evidence that the victim was subdued by a pair of handcuffs was inconsistent with the theory that the killing was provoked by a sudden and intense passion.

The State made its closing argument, which included the following statement:

"And you know from the evidence, ladies and gentlemen, that after [defendant] handcuffed [the victim] and before he stabbed him to death, something else happened. You know that there was semen found in Chuck Meyer's mouth and you know that he was stripped of his clothing from the waist down and only God knows and only God can tell us right now exactly the torture that Chuck Meyer went through before he ended his life in that trailer that night."

On May 18, 1989, the jury found defendant guilty of first degree murder. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1.) After having considered evidence in aggravation and mitigation, and thereafter finding that the murder was brutal and heinous, the trial court sentenced defendant to a term of 80 years' incarceration in the Illinois Department of Corrections. Defendant now appeals.

## Opinion

### I

First, defendant alleges that the trial court abused its discretion by denying his challenges for cause of Mr. Michael Milkovich, Mr. Richard Welch, Ms. Katherine Dollear, and Mr. Raymond Swope.

The People maintain that the trial court did not abuse its discretion by denying defendant's challenges because there is no encroachment upon a defendant's fundamental right to an impartial jury where defendant exhausts his peremptory challenges and is forced to accept a juror whom defendant finds unacceptable.

■■ ■ "A criminal defendant's right to trial by a fair and impartial jury is firmly rooted in our constitution." (*People v. Stone* (1978), 61 Ill. App. 3d 654, 666.) We have found that "[t]his right is so basic that a violation thereof requires a reversal." (*Stone*, 61 Ill. App. 3d at 666-67.) "This right should be guarded zealously ***." (*People v. Gaston* (1984), 125 Ill. App. 3d 7, 11.) "[T]he purpose of *voir dire* examination is to filter out prospective jurors who are unable or unwilling to be impartial." (*People v. Washington* (1982), 104 Ill. App. 3d 386, 390.) Our supreme court has found that "a person is not competent to sit as a juror if his state of mind is such that with him as a member

of the jury a party will not receive a fair and impartial trial." (*People v. Cole* (1973), 54 Ill. 2d 401, 413.) The determination of whether or not a prospective juror is impartial is within the sound discretion of the trial judge. (*Cole*, 54 Ill. 2d at 414.) A trial judge's determination will be set aside if it is contrary to the manifest weight of the evidence. (*Cole*, 54 Ill. 2d at 414; *Stone*, 61 Ill. App. 3d at 667.) A court may reverse a defendant's conviction where the juror expresses "self-doubt concerning [his] ability to be impartial." *Stone*, 61 Ill. App. 3d at 667.

In the instant case, we find that the trial judge's determination with respect to the challenges against Mr. Michael Milkovich, Mr. Richard Welch, and Mr. Raymond Swope was against the manifest weight of the evidence. (See *Cole*, 54 Ill. 2d at 414; *Stone*, 61 Ill. App. 3d at 667.) Defendant's right to a fair and impartial jury was violated. (See *Stone*, 61 Ill. App. 3d at 666-67.) These three jurors all equivocated when they were asked by the trial court whether they could be fair and impartial, and they testified that they had been victims of crimes, that their family members had been victims of crimes, or that their friends had been victims of crimes, some of which were violent crimes. Mr. Milkovich stated that his family members had been the victims of a robbery committed by one of his relatives and that his sister was involved in an armed robbery. When the trial court asked him if anything about those incidents would affect his ability to be fair, Mr. Milkovich answered, "I hope not."

Like Mr. Milkovich, Mr. Welch had been the victim of a crime. Mr. Welch was robbed at knife point. In addition, his mother had been struck by a hit-and-run driver. Furthermore, his friends had been burglarized and one of his friends had been beaten in front of his home. Like Mr. Milkovich, Mr. Welch was unable to state unequivocally that he could be impartial. When the trial court asked whether the crimes perpetrated upon his family and friends would impair his ability to be impartial, Mr. Welch responded, "Not really."

Finally, Mr. Swope testified that he had been robbed, that his car had been stolen, and that his mother and his wife had been raped. When the trial judge asked Mr. Swope whether those experiences would affect his ability to be fair, Mr. Swope replied, "I don't think so." The trial judge then attempted to obtain a more concrete answer, and he asked Mr. Swope again whether he could be impartial. Mr. Swope refused to give an affirmative answer. Instead, he repeated, "I don't think so." Only after further questioning by the trial court did Mr. Swope profess his ability to remain impartial.

■ Mr. Milkovich, Mr. Welch, and Mr. Swope were crime victims or they had close friends or relatives who were victims of violent crimes. In addition, they equivocated when first asked whether they could be fair and impartial. For these reasons, they should have been dismissed for cause. "[T]he purpose of *voir dire* examination is to filter out prospective jurors who are unable *** to be impartial." (*People v. Washington* (1982), 104 Ill. App. 3d 386, 390.) Moreover, a venireman is *incompetent* to sit as a juror if he cannot be impartial. (See *People v. Cole* (1973), 54 Ill. 2d 401, 413.) A reviewing court may reverse a conviction where a juror expressed "self-doubt concerning [his] ability to be impartial." (*People v. Stone* (1978), 61 Ill. App. 3d 654, 667.) The three aforementioned jurors expressed self-doubt with respect to their ability to be impartial. Therefore, we find that the trial judge's determination with respect to Messrs. Milkovich, Welch, and Swope was against the manifest weight of the evidence. See *Cole*, 54 Ill. 2d at 414; *Stone*, 61 Ill. App. 3d at 667.

■ However, we find that the trial court's decision with respect to Ms. Katherine Dollear was proper. We find that Ms. Dollear was not unfit to sit as a juror because she was a probation officer. There is no *per se* disqualification of jurors based upon an occupation as an officer of the court. (See *People v. Gaston* (1984), 125 Ill. App. 3d 7, 10-11.) Moreover, Ms. Dollear testified that she could be an impartial juror.

In addition, we agree with defendant that the People's reliance upon *People v. Johnson* (1987), 162 Ill. App. 3d 952, is improper because *Johnson* is distinguishable from the case at bar. In *Johnson*, defendant challenged a venireman for cause after the venireman gave equivocal responses to the trial court's questions. The trial court denied defendant's challenge for cause, and the venireman sat on the jury because defendant had exercised all of his peremptory challenges. *Johnson*, 162 Ill. App. 3d at 953-54.

Defendant in the *Johnson* case appealed and argued that the challenged venireman should have been dismissed for cause. (*Johnson*, 162 Ill. App. 3d at 953.) Defendant also argued that another venireman, whom he eventually challenged peremptorily, also should have been dismissed for cause. (*Johnson*, 162 Ill. App. 3d at 954.) The appellate court held that the equivocal responses of the venireman who actually sat as a juror were "not such that it could be determined that she could not be impartial." (*Johnson*, 162 Ill. App. 3d at 954.) As to the other venireman, the court found that "there can be no claim of prejudice" because the venireman in question did not sit on the jury. *Johnson*, 162 Ill. App. 3d at 955.

■ The People maintain that *Johnson* applies to defendant's claim that the trial court improperly failed to dismiss Mr. Swope for cause. We find that *Johnson* does not apply to the trial court's failure to dismiss Mr. Swope in this case. In *Johnson*, the trial judge assured himself that the venireman would try her best to be fair and impartial and obey the court's instructions. Here, where the trial judge questioned Mr. Swope, Mr. Swope initially had an equivocal response, "I don't think so." The judge repeated his question, and Mr. Swope gave the same equivocal answer. It was not until the trial judge asked Mr. Swope a leading question that Mr. Swope testified that he could be an impartial juror. Having been put on notice twice that Mr. Swope could not unequivocally state that he would be an impartial juror, the trial judge should have dismissed Mr. Swope for cause.

■ In addition, the People maintain that *Johnson* applies to defendant's allegation that the trial court failed to dismiss Messrs. Milkovich and Welch for cause, because defendant eventually used peremptory challenges to prevent those veniremen from becoming members of the jury. We are not persuaded by this argument because the *Johnson* court failed to acknowledge the possibility that prejudice may arise from a defendant's having to use a peremptory challenge against a venireman who should have been dismissed for cause. Moreover, the court failed to cite any authority for its conclusion that "there can be no claim of prejudice" once a defendant removes a venireman from the panel by exercising a peremptory challenge. *Johnson*, 162 Ill. App. 3d at 955.

In conclusion, we find that defendant was denied his right to an impartial jury, the verdict should be reversed and the cause remanded for a new trial. See *People v. Mitchell* (1982), 121 Ill. App. 3d 193, 196.

## II

### A

Next, defendant alleges that the trial court abused its discretion by refusing to charge the jury with defendant's proposed jury instruction for second degree murder and instructions with respect to the testimony of Mr. Alan Johnson.

The People maintain that the trial court properly refused defendant's request for a second degree murder instruction because a "lunge" does not qualify as evidence of serious provocation or intense passion. The People also assert that the trial court properly refused

defendant's accomplice-witness instruction since the witness had no knowledge of a crime and made no affirmative act to conceal a crime.

■ Section 9—2 of the Criminal Code of 1961 makes the following relevant provisions:

"Second Degree Murder. (a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9—1 of this Code and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed ***;

(2) ***

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(c) When a defendant is on trial for first degree murder and evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code. In a jury trial for first degree murder in which evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented and the defendant has requested that the jury be given the option of finding the defendant guilty of second degree murder, the jury must be instructed that it may not consider whether the defendant has met his burden of proof with regard to second degree murder until and unless it has first determined that the State has proven beyond a reasonable doubt each of the elements of first degree murder." (Ill. Rev. Stat. 1987, ch. 38, pars. 9—2(a)(1), (b), (c).)

In 1987, the Illinois General Assembly amended the Criminal Code of 1961 and replaced voluntary manslaughter with second degree murder.

■ We will now turn our attention to the common law. Our supreme court has found that " 'if there is evidence in the record which, if believed by a jury, would reduce the crime to manslaughter, a man-

slaughter instruction tendered by defendant must be given.' " (*People v. Leonard* (1980), 83 Ill. 2d 411, 420-21, quoting *People v. Handley* (1972), 51 Ill. 2d 229, 235.) In addition, the Illinois Supreme Court has recognized mutual combat as serious provocation sufficient to reduce a homicide to voluntary manslaughter. (*Leonard*, 83 Ill. 2d at 420-21; *People v. Healy* (1988), 168 Ill. App. 3d 349, 353.) Mutual combat exists where the parties willingly enter into combat upon equal terms and in the heat of passion. (*People v. Miller* (1981), 96 Ill. App. 3d 212, 215.) Where there is sufficient evidence of mutual combat in the record, it is reversible error to refuse such an instruction. See *Leonard*, 83 Ill. 2d at 420-21; *Healy*, 168 Ill. App. 3d at 353.

■ We find that the trial court erred when it failed to charge the jury with defendant's proposed jury instruction for second degree murder. In the instant case, there was sufficient provocation to warrant the giving of a second degree murder instruction because there was substantial evidence of mutual combat. Mr. Alan Johnson testified that defendant told him that the victim "lunged" at him before he stabbed the victim. In addition, Mrs. Alan Johnson testified that defendant told her that the victim had started a fight which resulted in his death. Mrs. Johnson also testified that on the morning after the victim's death, she noticed that defendant's hands were "swollen and cut and bruised."

Moreover, the instant case is analogous to *People v. Leonard* (1980), 83 Ill. 2d 411, *People v. Craven* (1973), 54 Ill. 2d 419, and *People v. Healy* (1988), 168 Ill. App. 3d 349. Each of these cases involves jury instructions with respect to voluntary manslaughter, which is now classified as second degree murder. In *Leonard*, the trial court denied the defendant's request for a voluntary manslaughter instruction based upon serious provocation. At trial, the defendant had introduced evidence showing that he had suffered injuries consistent with those acquired during mutual combat, including lacerations on his right hand. (*Leonard*, 83 Ill. 2d at 416.) There was no evidence as to the circumstances under which the defendant's injuries were sustained. The Illinois Supreme Court ruled that there was sufficient evidence of mutual combat to require a voluntary manslaughter instruction, and affirmed the appellate court's reversal of the trial court's refusal to give the requested instruction. *Leonard*, 83 Ill. 2d at 422-23.

Earlier, in *People v. Craven* (1973), 54 Ill. 2d 419, the Illinois Supreme Court recognized that testimony from witnesses for the People could provide the predicate for a voluntary manslaughter instruction. (*Craven*, 54 Ill. 2d at 425.) In this case, one of the State's witnesses

testified that prior to the victim's death, the defendant and the victim were engaged in mutual combat. (*Craven*, 54 Ill. 2d at 425.) Additionally, there was evidence that the defendant's arm was lacerated. (*Craven*, 54 Ill. 2d at 423-24.) The Illinois Supreme Court reversed the defendant's conviction, holding that the mere presence of evidence that would reduce the offense to voluntary manslaughter necessitated the giving of the instruction. *Craven*, 54 Ill. 2d at 425-26.

Similarly, in *People v. Healy* (1988), 168 Ill. App. 3d 349, this court reversed and remanded a murder conviction on the ground that the trial court refused to instruct the jury on voluntary manslaughter. There, the evidence showed that the defendant sustained a laceration on his right hand during an altercation with the victim. (*Healy*, 168 Ill. App. 3d at 353.) There was no evidence as to how the altercation began or how the defendant sustained the injury. (*Healy*, 168 Ill. App. 3d at 353.) We found that "the jury *** should have been permitted to decide whether this homicide was murder or manslaughter," because there was evidence from which the defendant could have argued that the combat was "mutually entered into." *Healy*, 168 Ill. App. 3d at 354.

The instant case is analogous to the three aforementioned cases. In *Craven*, a witness for the People testified that the defendant and the victim were involved in mutual combat prior to the killing. (See *People v. Craven* (1973), 54 Ill. 2d 419, 425.) Similarly, in the case at bar, Mr. and Mrs. Johnson, who were witnesses for the People, testified that defendant and the victim were involved in mutual combat prior to the victim's death. In addition, in both *Leonard* and *Healy*, the defendants sustained lacerations to their hands from combat with the respective victims. (See *People v. Leonard* (1980), 83 Ill. 2d 411, 416; *Healy*, 168 Ill. App. 3d at 353.) In the case at bar, defendant's hands were bruised and lacerated in the course of his altercation with the victim.

For these reasons, the trial court's refusal to charge the jury with defendant's proposed second degree murder instruction constituted reversible error. In Illinois, where there is sufficient evidence of mutual combat in the record, it is reversible error to refuse such an instruction. See *Leonard*, 83 Ill. 2d at 420-21; *Healy*, 168 Ill. App. 3d at 353.

## B

Next, defendant maintains that the trial court erred in refusing to instruct the jury that the testimony of Mr. Alan Johnson should be considered with caution. Defendant proffered a jury instruction (IPI

Criminal 2d No. 3.17) concerning the testimony of an accomplice, based upon the testimony of Mr. Alan Johnson that he assisted defendant in concealing the murder of Charles Meyer.

■■■ "A person commits the offense of concealment of homicidal death when he conceals the death of any other person *** [who] has died by homicidal means." Ill. Rev. Stat. 1987, ch. 38, par. 9—3.1(a); see *People v. Kirkman* (1988), 170 Ill. App. 3d 106, 110.

■■■ A cautionary instruction should be given where there is probable cause to believe that the witness could be found guilty as an accomplice. (*People v. Carreon* (1987), 162 Ill. App. 3d 990, 995-96.) An accomplice is one who himself could be indicted for the offense either as a principal or as an accessory. (*People v. Cobb* (1982), 97 Ill. 2d 465, 476; *People v. Nowak* (1970), 45 Ill. 2d 158, 168.) Where there is sufficient evidence that the witness was an accomplice, the failure to give a cautionary instruction may constitute reversible error. See *People v. Baker* (1982), 110 Ill. App. 3d 1015, 1020.

■■■ In the case at bar, the trial court refused the instruction. However, the proffered instruction should have been given because at the time of Mr. Johnson's testimony, defendant was also charged with concealment. Moreover, by Mr. Johnson's own admission, he could have been indicted and found guilty of concealment. (See *Cobb*, 97 Ill. 2d at 476.) Mr. Johnson testified that he lit a fire on the morning after the victim's death in which the victim's trousers were burned. In addition, he testified that he mowed the lawn in order to "conceal that there was blood on the lawn."

We are not persuaded by the People's claim that the trial court properly refused defendant's accomplice-witness instruction because Mr. Johnson had no knowledge of the crime and committed no affirmative act to conceal the crime. The record indicates that on November 21, 1987, defendant told Mr. Johnson that he had killed "Chuck." On that same day, Mr. Johnson ignited the fire that defendant used to burn the victim's trousers, and Mr. Johnson admits that he mowed the lawn over the blood spots on the grass in order to "conceal" the blood on the lawn.

Accordingly, we find that the trial court erred when it failed to instruct the jury to view Mr. Johnson's testimony with caution. (See *People v. Baker* (1982), 110 Ill. App. 3d 1015, 1020.) The trial court's failure to give the accomplice-witness instruction constitutes error which warrants a reversal.

### III

Third, defendant contends that the trial court abused its discre-

tion by denying his pretrial motions *in limine*. Specifically, defendant alleges that the trial court erred when it denied his motion to preclude evidence of a trace of semen found in the victim's mouth because the trace of semen was never linked to defendant and was therefore irrelevant and, even if relevant, the probative value of the evidence was substantially outweighed by its prejudicial effect. Defendant also alleges that the trial court erred by denying his motion to preclude evidence of his alleged bisexuality and his alleged violent character. Defendant maintains that his alleged bisexuality was irrelevant to the offenses for which he was charged, and that the testimony concerning his alleged violent character constituted improper character evidence.

The People maintain, first, that the trace of semen, considered with other evidence, showed defendant's motive and intent in this case. Second, the People maintain that statements of defendant alluding to his desire to torture and kill someone were not offered to show defendant's propensity for violence or that defendant was of bad character, but were properly offered as relevant to defendant's motive and intent.

In *People v. Escobar* (1988), 168 Ill. App. 3d 30, we made the following finding:

> "A motion *in limine* is addressed to the trial court's inherent power to admit or exclude evidence. If the rules of evidence do not require exclusion of the disputed material, then the trial judge must deny the motion. If the material should be excluded, *** the trial judge has the discretion to either grant or deny the motion. *** A court of review will not reverse a trial judge's grant or denial of a motion *in limine* absent a manifest abuse of discretion." *Escobar*, 168 Ill. App. 3d at 43.

In Illinois, "[n]o evidence is admissible unless it is relevant. [Citation.] In order to be relevant, the offered evidence must have a tendency to make the existence or non-existence of a fact of consequence more probable or less probable than it would be without the offered evidence." (*People v. Linscott* (1987), 159 Ill. App. 3d 71, 83.) "Evidence will be considered relevant where the circumstance or fact offered tends to prove or disprove a disputed fact or render the matter in issue more or less probable." *People v. Schultz* (1987), 154 Ill. App. 3d 358, 366.

However, "evidence will be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." (*Linscott*, 159 Ill. App. 3d at 84.) Inconclusive evidence of semen taken from a victim's body has no probative value on the issue of a murderer's

identity. (*Linscott*, 159 Ill. App. 3d at 85.) In addition, we have held that the probative value of evidence of a defendant's alleged homosexuality is "outweighed by its inflammatory effect upon the jury." *People v. Reimnitz* (1979), 72 Ill. App. 3d 761, 763, *cert. denied* (1982), 456 U.S. 906, 72 L. Ed. 2d 162, 102 S. Ct. 1751; see also *People v. Sales* (1986), 151 Ill. App. 3d 226, 233.

There are also limitations on the admissibility of character evidence. The admission of character evidence is restricted because " 'it [weighs] too much with the jury and [overpersuades] them as to prejudge one with a bad general record and deny him a fair opportunity to defend [himself] against a particular charge.' " (*People v. Harbold* (1984), 124 Ill. App. 3d 363, 384, quoting *Michelson v. United States* (1948), 335 U.S. 469, 476, 93 L. Ed. 168, 174, 69 S. Ct. 213, 218.) Accordingly, in *People v. Randle* (1986), 147 Ill. App. 3d 621, we made the following finding:

"When a theory of self-defense is raised in a *** homicide case, evidence of the peaceful or violent character of either party is relevant as circumstantial evidence to show whether the complainant or the accused was the initial aggressor. [Citation.] However, while such character evidence is always relevant, it may not always be admissible. Because of the inflammatory nature of such evidence, it must first be determined whether the danger of undue prejudice outweighs the relevance of the evidence." *Randle*, 147 Ill. App. 3d at 625.

We find that the trial court abused its discretion by denying defendant's pretrial motion *in limine* which sought to preclude the People from offering evidence of a trace of semen found in the victim's mouth. Arguably, evidence of the semen was relevant. The evidence had a tendency to make the existence of a consequence more probable (see *People v. Linscott* (1987), 159 Ill. App. 3d 71, 83), and it renders murder of the victim by defendant more probable (see *People v. Schulz* (1987), 154 Ill. App. 3d 358, 366). However, the probative value of this evidence is substantially outweighed by the danger of unfair prejudice. The People failed to link the specimen to defendant, or to the crime. This court has found that inconclusive evidence of semen found in the body of a victim has no probative value with respect to the issue of a murderer's identity. See *Linscott*, 159 Ill. App. 3d at 83-85; *Schulz*, 154 Ill. App. 3d at 366.

Moreover, as defendant has noted, *Linscott* and *Schulz* are analogous to the case at bar. *Linscott* was an appeal from a murder retrial. In *Linscott*, the court held that inconclusive evidence of semen taken from the body of a murder victim was irrelevant because it only

proved that defendant was a member of a large group of persons to whom the semen could have belonged. (*Linscott*, 159 Ill. App. 3d at 75.) The test did not show when the victim had had sexual contact. (*Linscott*, 159 Ill. App. 3d at 75.) Moreover, the defendant was not being tried for rape in his retrial. (*Linscott*, 159 Ill. App. 3d at 73.) The court held that the evidence did not have a tendency to prove anything relevant to the issue of whether defendant murdered the victim. *Linscott*, 159 Ill. App. 3d at 84.

Similarly, in *Schulz*, the court reversed the defendant's conviction where the People introduced testimony concerning blood samples that proved only that the defendant could not be excluded as a suspect. (*People v. Schulz* (1987), 154 Ill. App. 3d 358, 366.) The court found that the "testimony served no relevant purpose, was totally lacking in probative value, and thereby prejudiced defendant's cause." *Schulz*, 154 Ill. App. 3d at 366.

The case at bar is analogous to *Linscott* and *Schulz* because in all three cases the evidence was not linked to defendant, and defendant was not accused of a sexual offense. Therefore, we find that the trial court abused its discretion when it denied this motion. See *People v. Escobar* (1988), 168 Ill. App. 3d 30, 43.

In addition, we find that the trial court erred when it denied defendant's motion *in limine* which sought to preclude the People from introducing testimony about defendant's sexual orientation and his alleged violent character. Although, as the People argue, this evidence may be relevant with respect to defendant's identity and motive, we find that this evidence was inadmissible. We have found that the probative value of evidence of a defendant's alleged homosexuality is inflammatory and prejudicial. (See *People v. Reimnitz* (1979), 72 Ill. App. 3d 761, 763-64, *cert. denied* (1982), 456 U.S. 906, 72 L. Ed. 2d 162, 102 S. Ct. 1751; *People v. Sales* (1986), 151 Ill. App. 3d 226, 233.) Accordingly, in the case at bar, we find that the testimony of James McNamara about defendant's alleged bisexuality is outweighed by the danger of unfair prejudice.

Moreover, the prejudicial effect of this admission was compounded when the People inferred before the jury, during its closing argument, that the semen found belonged to defendant. This argument was inappropriate because the People never linked the semen to defendant, and the People's exploitation of this evidence prejudiced the defendant.

Moreover, the instant case is analogous to *People v. Sales*, (1986), 151 Ill. App. 3d 226. In *Sales*, this court reversed a conviction on the ground that defendant was deprived of a fair trial because the prose-

cutor referred to defendant's homosexuality in order to suggest that he was immoral and therefore guilty of the crime for which he was charged. (*Sales*, 151 Ill. App. 3d at 231-33.) In the case at bar, the State's inappropriate reference to defendant's alleged sexual orientation during its closing argument in which it was suggested that there was homosexual contact between the victim and defendant was prejudicial, and it constitutes reversible error.

■■■ Finally, we find that the trial court abused its discretion by denying defendant's motion *in limine* because the People should have been prohibited from offering the testimony of James McNamara concerning defendant's alleged violent character. Although such character evidence may be relevant, it is inadmissible if it is inflammatory, or the danger of unfair prejudice outweighs the relevance of the evidence. (See *People v. Randle* (1986), 147 Ill. App. 3d 621, 625.) We find that James McNamara's testimony was highly prejudicial and inflammatory, and that it invited the jury to conclude that defendant committed the crime because of his character. The admission of character evidence is restricted because it prejudices a jury against a defendant and deprives him of a fair opportunity to defend himself against the crime for which he was charged. (See *People v. Harbold* (1984), 124 Ill. App. 3d 363, 384, citing *Michelson v. United States* (1948), 335 U.S. 469, 476, 90 L. Ed. 168, 174, 69 S. Ct. 213, 218.) Again, we find that the trial court abused its discretion in denying defendant's motion *in limine*. See *People v. Escobar*, 168 Ill. App. 3d at 43.

## IV

Finally, defendant alleges that he was deprived of a fair trial because of the cumulative effect of the trial court's errors of law. Defendant correctly notes that the trial court made the following errors of law: (1) failure to dismiss three biased jurors for cause; (2) failure to instruct the jury as requested by defendant; and (3) denied defendant's motions *in limine*. Defendant maintains that each of these errors constitutes reversible error and merits the reversal of his conviction. However, defendant asserts that even if each of the errors is harmless individually, their cumulative effect requires reversal of his conviction.

The People maintain that the trial court did not err. In the alternative, the People maintain that if the trial court did err, all such errors were harmless both individually and in the aggregate.

This court has found that where individual errors made by a trial court would not merit reversal alone, the cumulative effect of the er-

rors may deprive defendant of a fair trial. Under such circumstances, due process and fundamental fairness require that a cause be remanded for retrial. *People v. Killian* (1976), 42 Ill. App. 3d 596, 601; *People v. Pendleton* (1974), 24 Ill. App. 3d 385, 397.

We also find that the cumulative effect of the errors of the trial court deprived defendant of a fair trial and warrants reversal.

For the aforementioned reasons, we reverse the decision of the trial court and remand this cause for a new trial.

Reversed and remanded.

LINN and McMORROW, JJ., concur.