THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANGEL T. SANCHEZ, Defendant-Appellant.

Fourth District   No. 4—88—0911

Opinion filed October 12, 1989.

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Donald D. Bernardi, State's Attorney, of Pontiac (Kenneth R. Boyle, Robert J. Biderman, and J.A.C. Knuppel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

Following a jury trial, the defendant, Angel T. Sanchez, was convicted of attempt (first degree murder) (Ill. Rev. Stat. 1987, ch. 38, pars. 8—4(a), 9—1(a)(1)) and sentenced to 50 years' imprisonment. On appeal, defendant argues (1) the introduction of and repeated reference to an out-of-court statement made by codefendant Jose Sanchez denied defendant his right to confront a witness against him, and (2) his 50-year sentence is disproportionate to the 30-year sentence imposed upon the codefendant. We disagree and affirm.

In March 1988, defendant and the codefendant were charged with attempt (first degree murder). On the day before their joint trial, the codefendant's case was severed because he had entered into a plea agreement with the prosecution. The plea agreement provided that if called as a witness in the defendant's trial, the codefendant would invoke the fifth amendment in response to any questions. The prosecution then filed a motion *in limine* seeking to bar the defendant from calling the codefendant at trial. However, during defendant's trial, the prosecution withdrew from the plea agreement, and the codefendant invoked his fifth amendment right not to testify.

A key witness at trial was Lieutenant Delector Kennedy, a guard at the Pontiac Correctional Center. Kennedy testified that on the day in question, he and the defendant argued several times. During these arguments defendant became hostile and told Kennedy that he was going to wind up just like Superintendent Taylor. Other evidence established that Superintendent Taylor had been killed at the institution

the year before. Later that same day, Kennedy noticed the defendant talking near the showers with the codefendant. Kennedy approached them and told them to leave. Defendant refused the order. Kennedy then ordered the defendant to turn around to be handcuffed. The defendant began to turn around, but then struck Kennedy with his fist. The two men began to wrestle when someone began to strike Kennedy in the back. Kennedy said that he did not see a weapon at this time. Kennedy then stated that he grabbed the defendant and began to use the defendant as a shield. It was at this time that Kennedy saw codefendant Jose Sanchez holding a knife. Kennedy stated that the codefendant tried to reach around defendant to continue the attack. Finally, the codefendant stabbed Kennedy in the arm, and defendant began holding Kennedy from behind in a full nelson. Kennedy then heard the codefendant say, "Mother fucker, we are going to kill you now."

Several others corroborated Kennedy's version of the day's events. Officer Rod Emmons testified that earlier that morning, he heard defendant make threats toward the victim, and that after lunch, he saw defendant stab the victim in the back as the codefendant held Kennedy. Emmons also testified that he heard the defendant and codefendant speaking to each other in Spanish. Lieutenant Tim Lovell testified that the defendant and codefendant continued speaking to each other in Spanish even after the fight had been broken up. Lewis Sinclair, an inmate who occupied a cell next to the defendant, testified that on the morning in question defendant had told Kennedy, "I will kick your ass. Quit harassing me."

Defendant testified that he had never threatened Kennedy. Defendant also denied that he stabbed the officer, planned anything with the codefendant, or knew that the codefendant had a weapon. Defendant did admit, however, that he had punched Kennedy several times and wrestled with him during the incident.

In rebuttal, Lovell testified that on the morning of the incident, he saw defendant put a knife in his waistband. As defendant did so, Lovell heard defendant say that he was "going to take care of his business."

On appeal, defendant argues that the out-of-court statement "We are going to kill you now," which was introduced during trial and emphasized during argument as substantive evidence against the defendant, was a violation of his State and Federal confrontation rights. We disagree.

■ No violation of defendant's confrontation rights occurred because the codefendant's out-of-court statement was properly received

into evidence. There are three separate grounds for the statement's admissibility: (1) it is not hearsay, and (2) even if it were hearsay, it would be admissible (a) under the coconspirator exception to the hearsay rule, and (b) under the declaration of intent exception to the hearsay rule.

In *People v. Carpenter* (1963), 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741, quoting McCormick, Law of Evidence §225 (1954), the court defined hearsay as follows:

> " 'Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' "

█ If a statement is not offered to show the truth of the matters asserted therein, it is not hearsay. The statement at issue in this case—the codefendant's statement to Kennedy during the struggle, "We are going to kill you now"—was not admitted into evidence to show the truth of the matter asserted, but was admitted simply to show that the statement was made. When this is the basis of admissibility, the fact that the statement was made must be relevant. As explained by Professor Graham:

> "[I]f the relevance of the statement depends upon the truth of the matter asserted or the declarant's belief in the truth or falsity of the matter asserted, the out-of-court statement is hearsay. Conversely, to the extent that an out-of-court statement is relevant simply because of the fact it was said, the statement is not barred by the Hearsay Rule." (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.1, at 505 (4th ed. 1984) (hereinafter Handbook of Evidence).)

The codefendant's statement was made at a time when he, the defendant, and Kennedy were all engaged in a physical struggle involving a knife. Given the close proximity of these men to each other during this struggle, the trier of fact could certainly have found that the defendant heard the codefendant's statement. That the defendant continued after hearing the codefendant's statement to hold Kennedy in a full nelson and to fight with Kennedy while the codefendant also fought with Kennedy are facts that make the codefendant's statement relevant.

At the State's request the jury was instructed on the law of accountability. (Illinois Pattern Jury Instructions, Criminal, No. 5.03 (2d ed. 1981) (hereinafter IPI Criminal 2d).) Accordingly, the jury was told in the issues instruction that one of the elements the State had to

prove beyond a reasonable doubt was the following: "Second: That the defendant, or one for whose conduct he is legally responsible, did so [performed an act which constituted a substantial step toward the commission of the offense of first degree murder] with intent to commit the offense of first degree murder." (See IPI Criminal 2d No. 6.07 (at 53).) Thus, to convict this defendant of attempt (first degree murder) based upon accountability, the State had to prove, among other things, a double intent: (1) that the defendant *intended* to promote or facilitate the commission of the offense of attempt being committed by his codefendant, and (2) the codefendant *intended* to kill the person he harmed.

In order to meet its heavy burden of proving this "double intent" beyond a reasonable doubt, the State should be entitled to elicit the evidence of the codefendant's statement, "We are going to kill you now." That evidence is strongly probative of the codefendant's intentions at that moment and equally so with regard to defendant, who was only a few feet away (at most) when the statement was made and who continued to fight thereafter with the victim.

According to Professor Graham:

"In another group [of statements] falling outside the category of hearsay, a statement made by one person that becomes known to another is offered for the purpose of showing the latter's state of mind as a circumstance under which the latter acted and as bearing upon his conduct. *** A statement is also not hearsay when offered for the purpose of showing that the listener was placed on notice, or had knowledge. *** [T]he fact that the statement was made is relevant for its effect on the listener without regard to the truth of the matter asserted." Handbook of Evidence §801.5, at 516-17.

Thus, the codefendant's statement, being admitted for the purpose of showing that defendant was placed on notice of the codefendant's intentions, is not hearsay and was properly received in evidence.

As we stated earlier, even if the codefendant's statement were hearsay, it would be admissible under two different exceptions to the hearsay rule.

"A statement expressing the declarant's then—existing state of mind, emotion, sensation, or physical condition, such as *intent, plan, motive, design,* mental feeling, pain, and bodily health, is admissible as a hearsay exception." (Emphasis added.) Handbook of Evidence §803.4, at 554.

■ Because of the heavy burden placed on the State to prove beyond a reasonable doubt the "double intent" we discussed earlier, the

codefendant's intentions are relevant and his statements are probative of those intentions. This "declaration of intent" exception to the hearsay rule is not often available because of the passage of time between the statement of the declarant and his subsequent conduct to which that statement pertains. Obviously there is no such problem in the present case. Here the entire fight was probably of a very short duration. Thus, the codefendant's statement was substantially contemporaneous with his acts to which that statement pertains.

██ The other exception applicable to the present case is the coconspirator exception to the hearsay rule. Declarations of a coconspirator made during the course of and in furtherance of a conspiracy are admissible against all conspirators upon an independent, *prima facie* evidentiary showing of a conspiracy or joint venture between the declarant and another defendant. (*People v. Goodman* (1980), 81 Ill. 2d 278, 283, 408 N.E.2d 215, 216.) The acts and declarations of a defendant and a codefendant may form the inferential basis for the existence of the conspiracy. *People v. Duckworth* (1989), 180 Ill. App. 3d 792, 536 N.E.2d 469; *People v. White* (1984), 122 Ill. App. 3d 24, 460 N.E.2d 802.

██ In the present case, the record supports an inferential basis for the existence of a conspiracy. Defendant and codefendant were talking when Kennedy approached. During the ensuing struggle, defendant held Kennedy with his arms behind his back in a full nelson while the codefendant tried to stab Kennedy with a knife. Defendant had threatened Kennedy earlier in the day and told him he was "going to end up like Taylor." An inmate heard defendant tell Kennedy he was "going to kick his ass." Also, another correctional officer testified that he saw defendant stab Kennedy during the time Kennedy was struggling with both defendant and the codefendant. After the incident, the defendant and codefendant continued to speak to each other in Spanish. Clearly, the record reveals the basis for the existence of a conspiracy. Accordingly, codefendant's statement, "We are going to kill you now," is admissible as substantive evidence against defendant under the coconspirator exception to the hearsay rule.

We note that if defendant's argument were correct, the statement of one defendant to a teller during a bank robbery, "Put the money in the bag," would not be admissible against his silent codefendant, standing next to the defendant and pointing a gun at the teller. The law could not tolerate such an absurd result.

The final issue defendant raises on appeal is whether his sentence of 50 years is disproportionate to the codefendant's sentence, pursuant to a plea agreement, of 30 years. We hold that it is not.

■ The Illinois Supreme Court held in *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541, that it is not the function of a reviewing court to serve as the sentencing court. A sentence within statutory limits should not be reduced merely because a reviewing court would have imposed a different penalty. (See *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) A sentence will be upheld when it reflects the seriousness of the offense and gives adequate consideration to the rehabilitative potential of the defendant. *People v. Kline* (1981), 99 Ill. App. 3d 540, 425 N.E.2d 562.

Defendant argues that his sentence is disproportionate to the codefendant's sentence because their criminal histories are largely the same. Defendant also argues that the codefendant played a more dominant role in the offense than did defendant.

The record on appeal does not contain comparable information concerning the history, character, and condition of the defendant and codefendant respectively. Based solely upon the remarks of counsel at the sentencing hearing, all this court knows of the codefendant is that he, too, was serving a murder sentence. The record contains a reference to the defendant's unlawful use of weapons juvenile adjudication when he was 14, but the record does not contain any reference to the codefendant's prior criminal or juvenile record.

Moreover, the degree of defendant's participation in the crime was not the same as the codefendant's participation. It was the defendant who had threatened the victim on several occasions on the day in question and who had said that he was going to "take care of his business." Also, it was the defendant who first punched the victim, pulled the victim to the location where the fight occurred, and held him so that the codefendant could stab him. According to one witness, the defendant also stabbed the victim.

■ Defendant fails to appreciate the distinction between the codefendant's entering into a plea agreement with the State and the defendant's being convicted after a jury trial. This distinction is not a matter of the defendant being punished for exercising his right to a jury trial; instead, this distinction is a matter of the codefendant being given a benefit to which he otherwise would not have been entitled. A trial court is allowed discretionary leniency in the sentencing of a defendant who assumes responsibility for his conduct by pleading guilty. *People v. Coustin* (1988), 174 Ill. App. 3d 824, 529 N.E.2d 89; *People v. McClendon* (1986), 146 Ill. App. 3d 1004, 497 N.E.2d 849.

■ In short, a sentence is supposed to fit both the crime and the criminal and to take into account the interests of the public in the administration of criminal justice. There is no basis in the law for a

claim that two defendants involved in the same offense must receive the same sentence. We are in agreement with the following views expressed in *People v. King* (1981), 102 Ill. App. 3d 257, 259-61, 430 N.E.2d 292, 294-95:

> "A longer sentence is not unfair because of the length of its term if it is based on valid sentencing factors in aggravation and mitigation. The length of his sentence may be viewed by the defendant as an index for gauging whether his sentence, as well as his trial, was fair. A defendant's personal assessment of the term of the sanction imposed, however, is not the operative fact upon which to determine whether a sentence is excessive.
>
> * * *
>
> Sentencing determinations are complex and challenging. To be fair to a defendant, and the community within which he must dwell, a just punishment must address the activity done, the likelihood of rehabilitation or further criminality by the actor, and the effect the crime has on society. The sanction imposed will only be fair when all sentencing factors are balanced. Recognition of the sentence imposed on a codefendant should also be weighed if properly before the court (Ill. Rev. Stat. 1979, ch. 38, par. 1005—4—1(b)). But such other penalty does not control the later sentencing determination. Rather, it amounts to another component to be considered by the judge sentencing the defendant before him.
>
> Rarely will a trial judge be confronted with two codefendants who are really similarly situated in terms of the wrong committed, their individual histories and personalities, or their disposition with respect to the criminal justice system [citations]. *** Defendants are not machines which can be calibrated or categorized for the purpose of legal argument. We should not expect trial judges to act as automatons when meting out punishment to a person who has been convicted of a crime. To conclude otherwise is to ignore the present realities which exist in our trial courts in the daily administration of justice."

■ Upon review of the record, we find that the trial court carefully considered all of the evidence before it. At the sentencing hearing, the court found that the defendant faced a range of 6 to 60 years for the Class X felony of which he was convicted. The court noted that the defendant and the codefendant had been lying in wait for the victim. The court considered the sentence the codefendant received on his plea agreement. The court concluded that an extended-term sen-

tence was necessary to deter further stabbings in the prison. Based upon this record, we find that the trial court did not abuse its discretion in sentencing the defendant to 50 years.

For the reasons stated, the conviction and sentence of the circuit court of Livingston County are hereby affirmed.

Affirmed.

McCULLOUGH, P.J., and LUND, J., concur.