THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOHNNY RAY PRESLEY, Defendant-Appellant.

Fourth District   No. 4—91—0643

Opinion filed June 18, 1992.

STEIGMANN, J., specially concurring.

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Scott H. Walden, State's Attorney, of Quincy (Norbert J. Goetten, Robert J. Biderman, and Elliott Turpin, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Defendant Johnny Ray Presley was charged by amended information in the circuit court of Adams County with four counts of first degree murder (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)) and one count of attempt (robbery) (Ill. Rev. Stat. 1989, ch. 38, pars. 18—1(a), 8—4(a)). After a jury trial, he was convicted on three counts of first degree murder and acquitted of attempt (robbery). He was sentenced to an extended term of 75 years' imprisonment. He now

appeals, claiming error in (1) the trial court's refusal of his involuntary manslaughter and second degree murder (see Ill. Rev. Stat. 1989, ch. 38, pars. 9—3, 9—2) jury instructions, (2) the admission of testimony concerning certain statements made by his nontestifying codefendant, and (3) the trial court's holding "in abeyance" judgments on two of the first degree murder counts.

The defendant, who lived in Dubuque, Iowa, testified he was visiting his mother in Quincy on the weekend of April 13, 1991. He and William Friday were charged with causing the death of Earl Bundy, Sr., on April 14, 1991, following a beating which took place at the home of Carla Williams, defendant's cousin.

Testimony at the trial was that defendant, Williams, and Bundy, together with Tony Black and Cindy Gredell, were at various bars in Quincy on the evening of April 13, 1991. All were drinking heavily. Gredell testified that she and Williams were drinking shots, mixed drinks, and beer. The men were drinking beer. She testified that everyone was intoxicated, especially Williams.

Defendant testified that he drank between 15 and 22 eight-ounce glasses of beer before the group went to Williams' house about 3:30 a.m. on April 14, 1991. Bundy was buying most of the drinks. Defendant testified that he had about $35 that night. Black testified that neither he nor defendant had any money. At some point that evening, the group was joined by Friday. Before they went to Williams' house, Bundy bought a case of beer at the bar to take with them. They all got into Bundy's car and drove to Williams' house. When they arrived there, they were talking and drinking the beer Bundy had purchased. Black testified that while he was in the kitchen, defendant talked to him about taking Bundy's money. He said defendant told him that Williams was going to try to get the money, and defendant did not specifically ask him to help rob Bundy.

Connie Manus, the 13-year-old babysitter who was staying that night with Williams' three small children, testified that when the group came into the house, Bundy sat on the couch in the living room with Williams, showing her some pictures. About 15 minutes later, Bundy and Williams went into Williams' bedroom, where Williams kept her pictures. Manus could see them sitting on the corner of the bed. There is a doorway between the living room and the bedroom, but there is no door on it.

Cindy Gredell testified that while she was in the kitchen she heard Williams call for her. She went into the bedroom. The lights were off, and the only source of light was from the living room and the television. Gredell observed Williams lying on her stomach on the bed and

Bundy lying on top of her. They both had their clothes on. Bundy appeared to be trying to get into Williams' pants and shirt. Gredell told Bundy to get off Williams, but he shoved her away. Williams told her to get defendant. Gredell and Williams both called for him. According to Gredell, defendant and Friday came into the room and defendant told Bundy to get off Williams or he would "beat his ass." Bundy replied, "No, she's not going to make a fool out of me." Defendant again told Bundy "for the last time" to get off or he would beat Bundy's "ass." Gredell testified that Bundy rolled part way off Williams and held himself up on the bed with his arms. Defendant then hit Bundy in the face with his fist, causing Bundy's head to snap back and hit the headboard. Defendant then lifted Bundy off the bed, hit him in the face again, and said, "If you want to fuck, I'll fuck you up your ass." According to Gredell, defendant made this statement twice. Friday said, "We might as well get that money he's been bragging about all night." Friday then took a wallet out of Bundy's back pocket.

Gredell testified that defendant continued to hit Bundy and shoved him into another adjacent bedroom. Defendant was bent over Bundy, hitting him. Friday also went into the other bedroom, and Gredell stood in the doorway telling defendant and Friday to stop hitting Bundy. Bundy was screaming for help. She testified that defendant and Friday were calling each other different names and that they called her by another name. When she replied that this was not her name, they said, "Shut up you stupid bitch and get out of here." She could see Friday kicking at Bundy, but it was dark and she could not see whether his foot hit Bundy. Once again, she told defendant and Friday to stop because they were frightening the children, who were in the adjacent bedroom. They told her to get out of there. At this point, Williams was passed out drunk in her bedroom. Gredell testified that at no time did she see Bundy hit defendant or Friday, or even attempt to do so in any way.

Gredell further testified that she left the bedroom and, when she returned a short time later, Bundy was covered with a blanket. Defendant and Friday were still hitting him. Gredell estimated that 15 to 30 minutes had elapsed from the time defendant and Friday first went into Williams' bedroom and the time Gredell went back in and saw the blanket over Bundy's head. Defendant told Friday to get a gun, and Friday pretended he had a gun. Friday put his hands to the back of Bundy's neck while the blanket was draped over his head. Friday told Bundy to tell him where the money was or Friday would

kill Bundy. Bundy replied, "If you're going to kill me, you fuckin' do it now."

Gredell testified that defendant and Friday asked Bundy for his car keys, and they then asked Gredell to get rid of the car. She later left in the car, but came back with it and returned the keys to Friday, saying she did not want to be involved. At that point, defendant was sitting on top of Bundy. She accused defendant and Friday of killing Bundy. Friday denied this, nudging Bundy's leg until he moved and mumbled something. Friday told defendant that Gredell had not gotten rid of the car. Either defendant or Friday said this was all right, since they would need the car anyway. When she went into Williams' bedroom later, Gredell saw blood on the floor and a yellow mop or broom handle.

Connie Manus testified that Gredell came into the kitchen and told her and Tony Black that there was a fight going on in the bedroom. She heard a couple of "thumps" from the bedroom. Then she heard Williams say "leave the old man alone." She and Black left the house and took a walk around the block. When they returned to the house, Black left. Gredell took Manus to Williams' mother's house. She could not get into the house, so she walked back to Williams' house. As she approached the house, she saw defendant and Friday throw Bundy off the front porch and drag him across the street. A blanket was draped across Bundy. They put him in the trunk of his car. She was standing on the front porch with Gredell. Defendant got into the driver's side of the car and Friday started to get in on the passenger's side. He then stopped and went to defendant's side and spoke with defendant, then Friday approached Manus and Gredell and told them not to tell because he did not want to see anything happen to their pretty faces. Gredell also testified to this threat. Friday said he and defendant were going down to the bottom roads.

Tony Black testified that he has only partial hearing in both ears. After Gredell came into the kitchen to tell him and Manus that there was fighting going on in the bedroom, he yelled at defendant and Friday to stop fighting. Someone shouted at him, "Mind your own fucking business," and "Get the hell out of here." He could not distinguish who said this. He did not, however, believe it was Bundy. He also heard someone yelling, asking where "it" was at, and someone else saying, "I don't know what you want. I don't know where it is. I don't have it." He believed it was Bundy who made these statements. Black testified that after he and Manus returned from their walk around the block, he stood at the front porch steps. He did not go in

the house. The front door was partially open. He heard screaming. He believed it was Bundy and that he was in severe distress.

The evidence also revealed that sometime later that morning there was a fire at the Williams house and Williams and two of her three children were killed.

Sergeant Gregory Scott of the Quincy police department testified that Bundy's car was found in the Mississippi River. Bundy's body was in the trunk, covered with the blanket. The body had only one shoe on. He also participated in the investigation of the fire at the Williams house. He located what appeared to be Bundy's other shoe at the house. He also found a yellow mop or broom handle that had been partially burned in the fire.

Donetta Smith testified that she, defendant, and her boyfriend, Damon Seiz, went riding around in a truck at mid-morning on April 14, 1991. Defendant told her to drive to the river. He then said that he had put a man in the trunk of a car, put the car in drive, and allowed it to go into the river. They all went to defendant's mother's house later, and defendant went to bed. The police pulled up outside the house, and Seiz awakened defendant to tell him the police were outside and that they probably were looking for defendant. Seiz then asked defendant if he had done it and defendant said yes. Defendant went out the back door of the house.

Dr. Grant Johnson testified that he performed an autopsy on Bundy's body. Bundy was 5 feet 6 inches tall and weighed 136 pounds. There were multiple abrasions over the facial region and contusions around the eyes. There were tears on the inside of the lips. He believed that some of the abrasions were inflicted after death. When the right eye was opened, it was very bloody. The facial injuries were all consistent with forceful blunt impact. A fist could have caused such damage. There were blows to the sides of the head, which caused deep hemorrhaging. Fairly substantial force would be required to inflict such injuries. Bundy's larynx had been fractured, which would have also required considerable force. Something blunt, such as a hand, forearm, leg, or foot would have had to cause this injury. In Dr. Johnson's opinion, the cause of death was the neck injury. Death most likely occurred within a matter of seconds. He testified, however, that he could not completely rule out drowning as a cause of the death. Even if Bundy did not drown, he would have died from the neck injury.

Dr. Johnson's testimony indicated there were substantial blows to Bundy's back which would have required great force to inflict. There were parallel marks on the back that were created by blows against

the skin with a slender, round object. There was deep hemorrhaging underneath these marks. Generally, the deeper the hemorrhaging, the more force was used to inflict the blows. The doctor believed that approximately nine separate blows were struck, but it was difficult to give an exact number since some of the marks appeared to be merged.

The doctor further testified to injuries to Bundy's buttocks. There was a tearing of the skin tissue between the buttocks adjacent to the anus. It appeared that some object had entered at that point and created a channel of about four inches in length alongside the rectum. There was a great deal of hemorrhaging there, which means the wound was inflicted before Bundy's death. The doctor testified such an injury would be extremely painful. It would take considerable force to plunge an instrument that far up into the rectum when it had to go through skin. The object used had a blunt end. When asked if the yellow mop or broom handle could have inflicted the injuries to the back and the injury to the rectum, he stated these injuries were consistent with the handle having been used. The doctor indicated it was likely that Bundy's jeans and underpants were pulled down at the time of the blows to his back and the injury to his rectum.

Bundy's blood-alcohol level was 0.059% and his urine level was 0.177. The doctor also testified there were no markings on Bundy's hands or arms that were similar to those on his back and buttocks. This indicates a lack of defensive effort on Bundy's part. The pattern of markings on Bundy's back and buttocks indicate that he was relatively immobile while the blows were being struck. Had he been moving around a lot, he would have sustained injuries to other parts of his body as well.

Defendant testified on his own behalf. Everyone at the house was pretty drunk. He stated he had no intentions of robbing Bundy and he did not talk with anyone about getting Bundy's money. When he heard Williams call his name, he walked into the bedroom and saw Bundy sitting on Williams. He told Bundy to get off. When Bundy did not do so, defendant told him to get off or he would not like defendant anymore. According to defendant, Bundy then got up and said, "[Y]ou ain't going to make no fool out of me, boy." Bundy began walking toward defendant. Defendant thought Bundy was going to attack him. Defendant then hit Bundy in the face, knocking him to the floor. Bundy's pants were unzipped and they came down when he fell to the floor. Defendant testified that he was angry that Bundy was trying to force himself on Williams. Defendant just wanted to get Bundy off Williams. When Bundy tried to get up, defendant tackled

him to the floor. He sat on Bundy's back and started beating on him. While he was doing this, he noticed that Friday had come into the room. Defendant denied striking Bundy in the neck area, and he stated he did not see anyone strike him there. Friday started kicking Bundy in the head. Defendant did not hear Friday say anything about Bundy's money. Friday took Bundy's shoe off his foot because Bundy said his money was there if they wanted it. Defendant denied trying to rob Bundy. He admitted striking Bundy with the broom handle about three times. He also admitted putting the handle up Bundy's rectum and then throwing the handle on the floor. He testified that Friday picked the handle up and hit Bundy with it.

Defendant and Friday beat on Bundy for about 15 to 20 minutes. Defendant testified he sat on Bundy's back because he did not want Bundy to get away. He said Bundy tried to fight back at first by squirming and trying to get on top of him, but that he overpowered Bundy. Bundy was a small man; in height, he came up to defendant's nose. Defendant admitted the incident could not be called a fight—it was a beating. After the beating was over, defendant and Friday tried, without success, to get everyone to leave the house.

Defendant further testified that Bundy walked out of the house under his own power. He denied that he and Friday dragged Bundy out of the house or threw him off the front porch. Defendant stated it was his intention to hide Bundy somewhere until he woke up. Defendant saw Friday walk over to Manus and Gredell and say something to them, but he did not know what was said and he did not tell Friday to say anything to them. Defendant believed Bundy was alive when he was placed in the trunk.

After Bundy was in the trunk, defendant drove the car away. At some point, Friday took over the wheel and drove to the river. Friday said they had to get rid of Bundy because he could get them for kidnapping. Friday pulled the car up to a boat ramp and said they could get rid of the car there. Defendant testified that he protested against doing this, as it would kill Bundy. Defendant said he told Friday to let him out of the car. Friday put the car in drive and let it go into the river. He and Friday then walked back to town. Defendant testified he did not intend to kill Bundy.

## I

On appeal, defendant's first claim of error is that the trial court should have given his tendered instructions on involuntary manslaughter. Defendant was charged with four counts of first degree murder.

Count I of the amended information charged that defendant beat Bundy and placed him in the Mississippi River with the intent to kill him. Count II alleged intent to do great bodily harm to Bundy, thereby causing his death. Count III alleged that defendant knew his acts created a strong probability of death or great bodily harm to Bundy, thereby causing his death. Count IV alleged felony first degree murder, based upon the alleged attempt to rob Bundy. Defendant was convicted on counts I, II, and III, and acquitted on count IV.

The main difference between first degree murder and involuntary manslaughter lies in the mental state which accompanies the conduct causing the homicide. Section 9—1(a) of the Criminal Code of 1961 (Code) defines first degree murder as follows:

"First degree Murder—Death penalties—Exceptions—Separate Hearings—Proof—Findings—Appellate procedures—Reversals.

(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) He is attempting or committing a forcible felony other than second degree murder." (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a).)

A person acts intentionally when his conscious objective or purpose is to accomplish the result or engage in the conduct proscribed. Ill. Rev. Stat. 1989, ch. 38, par. 4—4.

Involuntary manslaughter is defined by section 9—3(a) of the Code in pertinent part as follows:

"Involuntary Manslaughter and Reckless Homicide. (a) A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly ***." Ill. Rev. Stat. 1989, ch. 38, par. 9—3(a).

"Recklessness" is defined by section 4—6 of the Code, which states in pertinent part:

"Recklessness. A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described

by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Ill. Rev. Stat. 1989, ch. 38, par. 4—6.

When there is evidence in the record which, if believed by the jury, would reduce a crime from murder to manslaughter, an instruction on manslaughter should be given. (*People v. Foster* (1987), 119 Ill. 2d 69, 87, 518 N.E.2d 82, 89.) This is true even if the evidence is very slight. (*People v. Stevenson* (1990), 196 Ill. App. 3d 225, 230, 553 N.E.2d 441, 445, *appeal denied* (1990), 133 Ill. 2d 569, 561 N.E.2d 703.) However, an involuntary manslaughter instruction should not be given when the evidence clearly shows the homicide to be murder. *Foster*, 119 Ill. 2d at 87, 518 N.E.2d at 89.

Defendant maintains that the evidence supported an instruction on involuntary manslaughter. He points to his testimony that he did not intend to kill Bundy and his testimony that he abandoned the car when he learned Friday was going to let it go into the river. He also alleges there was no evidence showing that he struck the fatal blow to Bundy's neck. He further argues that the fact neither he nor Friday used a gun or a knife evidences a lack of intent to kill. Defendant also relies on the evidence that he and Bundy were intoxicated. He argues this may indicate recklessness sufficient to support an involuntary manslaughter instruction. We reject these contentions.

■■ In order to support an involuntary manslaughter instruction, there must be some evidence in the record, however slight, that defendant did not intend to kill or injure Bundy, but that defendant's acts resulted from some reckless conduct on his part.

This case is unlike the factual situation in *People v. Wright* (1986), 111 Ill. 2d 18, 488 N.E.2d 973, which is cited by defendant in support of his arguments. In that case, the defendant shot and killed her daughter. The evidence showed that on the day of the killing, defendant had been drinking and was intoxicated through the combined effects of the alcohol and medication. She awoke from an alcohol-induced sleep when she heard noises downstairs. Forgetting that her daughter was in the house, she went to the top of the stairs with a gun and asked who was there. Her daughter appeared and asked why she was holding a gun. The gun discharged, killing her daughter. The defendant testified she thought the gun was pointed toward the wall and that she had not intended to fire the weapon or to kill her daughter. She was ultimately convicted of involuntary manslaughter. *Wright*, 111 Ill. 2d at 21-25, 488 N.E.2d at 975-76.

In the instant case, we do not have a situation where defendant administered one or two blows that might have unexpectedly caused Bundy's death. Defendant admitted that he and Friday beat Bundy for a period of 15 to 20 minutes, while holding him down so that he could not escape. The pathologist testified to the severe injuries Bundy suffered as a result of the beating and from the handle which defendant admitted to jamming up Bundy's rectum. The savage nature of the beating negates any suggestion of recklessness. This conclusion is supported by other cases not cited by defendant wherein vicious beatings have been administered and involuntary manslaughter instructions have been refused by the trial courts. In *People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696, defendant severely beat a four-year-old child with a mop stick, causing his death. The pathologist testified the child had suffered multiple linear bruises too numerous to count. His face, arms, legs, chest, back, and buttocks were swollen and deeply bruised. The defendant was convicted of murder. The appellate court reversed the conviction, finding the trial court should have instructed the jury on involuntary manslaughter. This finding was based upon the defendant's testimony that he had not intended to kill the child. The supreme court reversed the appellate court, finding there was no evidence in the record to show reckless conduct. The court stated that even if defendant's statement that he did not mean to kill the child was considered some evidence of reckless conduct, the severity of the beating negated any suggestion that the conduct was merely reckless. *Ward*, 101 Ill. 2d at 446-51, 463 N.E.2d at 697-700.

In *Foster*, the defendant was convicted of murder for the beating death of his girlfriend. There was evidence that the defendant was staggering and looked like he was "high." The evidence showed, and defendant himself admitted, that he repeatedly struck the victim with a baseball bat on her legs, arms, and back. He then inserted the broken bat handle in her rectum. The pathologist testified the victim died as the result of multiple blunt trauma, resulting in swelling of her brain and internal hemorrhaging of her liver. The trial court rejected defense instructions on involuntary manslaughter. The supreme court affirmed the conviction. In rejecting defendant's contention that his conduct was reckless because he was in an intoxicated and drugged condition and that he was acting out of extreme jealousy, the court pointed to the severity of the victim's injuries and the defendant's own testimony that he deliberately struck the victim numerous times with the bat. The court then observed that:

"A voluntary and willful act which has the natural tendency to cause death or great bodily harm is sufficient evidence of the intent required for the offense of murder. [Citations.] Though intoxication may support a finding of recklessness [citation], the record in no way supports the defendant's claim that he was intoxicated at the time of the beating." *Foster*, 119 Ill. 2d at 88, 518 N.E.2d at 90.

Defendant here seeks to use his alleged intoxication to support his refused involuntary manslaughter instruction. However, we reject that argument. Although there was evidence of heavy drinking by defendant, it is clear from the evidence that defendant knew what he was doing during that evening. He himself testified as to the beating of Bundy and putting the car in the river with Bundy in the trunk. He had no difficulty recalling details of what was done to Bundy. The severity of the beating itself negates any suggestion of recklessness, despite defendant's intoxication. We conclude that the trial court properly refused to instruct the jury on involuntary manslaughter.

Defendant's second claim of error is that the trial court should have given the jury his tendered instruction on second degree murder. Second degree murder is defined by sections 9—2(a) and (b) of the Code as follows:

"Second Degree Murder. (a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9—1 of this Code and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed; or

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." Ill. Rev. Stat. 1989, ch. 38, pars. 9—2(a), (b).

Defendant contends there is evidence in the record from which the jury could have found the existence of adequate provocation by Bundy, thereby mitigating the crime from first degree murder to second degree murder. According to defendant, this provocation con-

sisted of Bundy's alleged attempted rape of defendant's cousin, to whom the evidence showed defendant was close. In addition, defendant points out that he was threatened by Bundy after defendant twice told Bundy to get off Williams. Defendant also refers to the parties' alleged intoxication as further mitigating evidence.

Traditionally, there are four situations which have been recognized by Illinois courts as involving serious provocation: (1) substantial physical injury or assault, (2) mutual quarrel or combat, (3) illegal arrest, and (4) adultery with the offender's spouse. However, neither mere words nor gestures constitute adequate provocation. *People v. McCarthy* (1989), 132 Ill. 2d 331, 340-41, 547 N.E.2d 459, 462-63.

■ Nothing that happened at the Williams' house even remotely fits any of these categories. In fact, defendant does not specifically argue that any of these categories apply. Rather, he seeks to rely upon the facts of (1) the alleged attempted rape, (2) his testimony that Bundy verbally threatened him and approached him as if to attack him, and (3) defendant's intoxication.

Defendant's intoxication does not serve to mitigate this crime to second degree murder. He cites *People v. Healy* (1988), 168 Ill. App. 3d 349, 522 N.E.2d 749, in support of his intoxication argument. However, defendant's reliance on that case is misplaced. In *Healy*, the defendant stabbed the victim, who later died. There was evidence of a fight between the defendant and the victim. There was also evidence of the defendant's intoxication. In the fight, the defendant suffered a cut to his hand. The trial court refused a voluntary manslaughter instruction. The appellate court reversed, stating the instruction should have been given. There was conflicting evidence as to how the fight started and as to whether the defendant or the victim drew the knife. (*Healy*, 168 Ill. App. 3d at 350-54, 522 N.E.2d at 750-52.) In the instant case, there was no evidence of mutual combat. Even assuming Bundy approached defendant after being told to get off Williams, the evidence is clear that Bundy never struck defendant even once. He put up no defense. Defendant testified to this fact, and the pathologist's testimony as to the lack of defensive wounds on Bundy's hands and arms confirmed this testimony.

As to defendant's claim of adequate provocation, the evidence was conflicting concerning whether Bundy approached defendant or threatened him after defendant told him to get off Williams. Gredell testified that after being told the second time to get off, Bundy rolled off Williams but remained on the bed. She testified that defendant then hit Bundy, causing his head to snap back and strike the headboard of the bed. Defendant testified that Bundy walked toward him

and said, "You ain't going to make no fool out of me, boy." However, Gredell testified that when defendant told Bundy to get off Williams, Bundy said, "No, she's not going to make a fool out of me," apparently referring to Williams. Even if Bundy's actions could be considered provocation, we would be compelled to find the provocation was entirely inadequate to justify defendant's response. Defendant's beating of Bundy was grossly out of proportion to any provocation Bundy may have provided. A crime is murder when a defendant attacks a victim with violence that is out of proportion to the provocation. (*People v. Austin* (1989), 133 Ill. 2d 118, 127, 549 N.E.2d 331, 335.) Here, defendant participated in a prolonged beating of Bundy with a blunt object. Bundy put up no defense. In fact, defendant himself testified that Bundy tried to get away and that defendant, who was larger than Bundy, sat on him to keep him from escaping. Williams, Gredell, and Black all told defendant and Friday to stop beating Bundy. When the beating was finished, defendant and Friday placed Bundy in the trunk of his car and ran the car into the river, thus drowning him if he was not already dead from the beating. This extreme violence certainly was unnecessary if, as defendant testified, all he wanted to do was to get Bundy off Williams. As a matter of law, defendant was not entitled to a jury instruction on second degree murder.

## II

Defendant's next claim of error involves the admission into evidence of certain alleged hearsay statements made by the nontestifying codefendant William Friday and some alleged misstatements of the evidence by the prosecutor in closing argument.

Manus and Gredell testified that after putting Bundy in the trunk of the car, Friday approached them and told them to keep their mouths shut if they wanted to keep their pretty faces. This testimony was elicited by the prosecutor. Defense counsel raised no objection to the testimony of either witness. In fact, on cross-examination of Gredell, defense counsel asked her about Friday's statements, thus eliciting this testimony once again. No claim of error as to these statements was raised in defendant's post-trial motion.

Defendant also complains of the prosecutor's closing argument concerning Friday's statements to Manus and Gredell. The prosecutor made the following comments:

"Then Mr. Friday comes over, says 'We're going to go down to the Bottoms and we're going to leave him down there,' and he threatens both Cindy and Connie, threatens that they will hurt their pretty faces, something to that effect. And it scares them,

and both of them told you that. At the time that both of them were initially interviewed on April 14th, both the defendant and Mr. Friday were still at large, so their fear was very real, and for good reason. I suppose people say, 'Oh, I'll kill you' and you don't think much about it, but after you have just seen them kill somebody, somehow that threat comes a little closer to the heart and means a little more than it might otherwise have."

Defendant claims the prosecutor misstated the evidence. He points out the evidence did not show that Friday stated he and defendant were going to leave Bundy "down there." He also claims that Manus did not see the fight and that Gredell saw Bundy alive before he was taken from the house.

Defendant also claims error in the introduction into evidence, through Gredell, of other statements made by Friday. He complains of the following testimony:

"A. [By Gredell:] He told Will to get that gun out and Will acted like he had a gun.

Q. [By the prosecutor:] How did Will act like he had a gun?

A. With his hands.

Q. What did he do with his hands?

A. Put them up on the back of Earl's neck.

Q. And did Will Friday say anything at this point?

A. He told him that he'd better tell him where the money is or Will was going to kill him."

Defendant claims this evidence was damaging because it suggested to the jury that defendant had an intent to kill Bundy. He claims its admission was reversible error. Defendant complains this error was exacerbated by the prosecutor in his rebuttal closing argument, when he made the following statements: "The defendant says [to codefendant Friday], 'Get the gun.' The pretend gun is put there. And the defendant says, 'Give us the money or we will shoot you.'" Defendant claims the evidence did not show he was the one who made the last statement quoted.

We note that defense counsel made no objection to any of the complained-of testimony. He also failed to object to the alleged misstatements of evidence by the prosecutor in closing argument. None of these claims of error were raised in defendant's post-trial motion.

In order to preserve a claim of error for appellate review, an objection must be made at trial and the error must be raised in a defendant's post-trial motion. Failure to do so, in the absence of plain error, waives the issue on appeal. (*People v. Enoch* (1988), 122 Ill. 2d

176, 186, 522 N.E.2d 1124, 1130.) Under the plain-error doctrine, an appellate court may consider claimed error that has not been properly preserved, if the error deprived the accused of a fair trial or the evidence is closely balanced. *People v. Pickett* (1973), 54 Ill. 2d 280, 282-83, 296 N.E.2d 856, 858; *People v. Whitehead* (1987), 116 Ill. 2d 425, 447-48, 508 N.E.2d 687, 695.

While the plain-error doctrine is not applicable to this case, we elect to discuss defendant's contentions of error in the interests of future judicial economy. We find his arguments to be without merit.

■ Defendant claims the codefendant's statements that were testified to by Manus and Gredell incriminated him and were improperly admitted in violation of his right to cross-examine witnesses as guaranteed by the sixth and fourteenth amendments to the United States Constitution (Constitution) (U.S. Const., amends. VI, XIV). In support of this argument, defendant cites *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. In *Bruton*, defendant Bruton and codefendant Evans were tried jointly on a Federal charge of postal armed robbery. Evans did not testify. A postal inspector was allowed to testify that Evans had confessed to him that Bruton and Evans had committed the robbery. The trial judge instructed the jury that Evans' confession could be considered against him, but that it was inadmissible hearsay as to Bruton and could not be considered as evidence against him. Both defendants were convicted. On appeal, the United States Supreme Court reversed Bruton's conviction, holding that admission of Evans' confession in the joint trial deprived Bruton of his right to cross-examination under the confrontation clause of the sixth amendment to the Constitution. The Court stated that instructing the jury not to consider the confession against Bruton was insufficient to ensure that the jury would not use the extrajudicial confession of Evans in considering Bruton's guilt or innocence. *Bruton*, 391 U.S. at 126, 20 L. Ed. 2d at 479, 88 S. Ct. at 1622.

Defendant's reliance on *Bruton* is misplaced. The rule enunciated in that case applies to a confession or other statement of a nontestifying codefendant which is used to inculpate the defendant in the crime. (*People v. Cruz* (1988), 121 Ill. 2d 321, 324, 521 N.E.2d 18, 19; see also *People v. Allen* (1983), 119 Ill. App. 3d 186, 193, 456 N.E.2d 336, 341.) The statement made by Friday to Manus and Gredell, warning them to keep quiet if they wanted to keep their pretty faces, was not a confession or admission and did not inculpate defendant. The statement made by Friday that he and defendant were going down to the bottom roads was also not a confession or admission. Friday's statements (as he placed his hands at the back of Bundy's neck)

advising Bundy to tell Friday where the money was or he (Friday) would kill Bundy did not inculpate defendant.

We note this is not a case wherein a defendant denies he participated in the criminal activity. (See *People v. Johnson* (1987), 116 Ill. 2d 13, 506 N.E.2d 563 (where defendant denied he participated in an attempted armed robbery and murder and the testimony of police officers was allowed as to statements of nontestifying codefendants identifying defendant as the man who killed the victim, resulting in a reversal on appeal for violation of the *Bruton* rule).) Here, Gredell, who was not charged with any crime, testified she saw defendant beating Bundy. Defendant himself testified at the trial and admitted his involvement. Defendant concedes he is guilty of some crime. The major question in this appeal involves whether the evidence allowed the jury to be instructed on the lesser offenses of second degree murder and involuntary manslaughter. This is not a case for the application of *Bruton*. Defendant was not deprived of his constitutional right of confrontation under the sixth and fourteenth amendments.

■ As for alleged misstatements of the prosecutor in closing argument, even were we to find error in those statements, we would be compelled to conclude that it did not rise to the level of plain error so as to relieve defendant of his failure to properly preserve the issue. The evidence against defendant was not closely balanced. Defendant himself testified and admitted his guilt. In light of our holding that no evidence exists from which the jury could have found defendant guilty of either of the lesser offenses of second degree murder or involuntary manslaughter, any alleged error in the prosecutor's closing argument was harmless.

### III

■ Defendant's last contention is that the trial court erred in holding two of his vacated murder convictions "in abeyance," pending resolution of this appeal. The trial court vacated the judgments on defendant's convictions in count II (charging intent to do great bodily harm, resulting in death) and count III (charging acts done with knowledge that death or great bodily harm would result). However, the trial court also ordered the vacated convictions held "in abeyance," pending appeal. The State concedes the proper procedure is to merely vacate the convictions under counts II and III.

Where a defendant is convicted of multiple charges of murder and only one person has been killed, the convictions on the less serious murder charges should be vacated. (*People v. Guest* (1986), 115 Ill. 2d 72, 103-04, 503 N.E.2d 255, 269.) Here, the charge of intentional mur-

der is deemed the most serious offense. The convictions on the other murder charges should be vacated. The judgment of the trial court should be modified to vacate the judgments on the convictions on counts II and III.

Defendant's conviction of murder under count I of the amended information is affirmed. The judgment order is modified, vacating the judgments on defendant's convictions on count II and count III and striking therefrom the words "and held in abeyance pending appeal."

Affirmed in part; vacated in part and remanded with directions.

KNECHT, J., concurs.

JUSTICE STEIGMANN, specially concurring:

Although I agree with the result reached by the majority opinion, I write separately (1) to point out my disagreement with the majority opinion's discussion of *Bruton,* and (2) to comment on the trial court's selection of instructions and verdict forms.

I

On appeal, defendant argues that admitting into evidence certain hearsay statements made by the nontestifying codefendant, William Friday, violated his constitutional right to cross-examine witnesses, as guaranteed by the sixth and fourteenth amendments. He cites *Bruton* in support of this argument, and this court addresses defendant's *Bruton* argument on the merits before rejecting it. In my judgment, this court should not do so.

In their treatise on criminal procedure, Professors Wayne R. La-Fave and Jerold H. Israel wrote the following:

"In *Bruton,* the Court emphasized that it was dealing with a case in which 'the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence.' Lower courts have thus concluded that *Bruton has no application when a statement by defendant's partner in crime is received under some exception to the hearsay rule. Illustrative are cases where the evidence was admissible because the statement was made by a co-conspirator during the course of and in furtherance of the conspiracy* ***. These decisions seem correct in light of *Dutton v. Evans* [(1970), 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210], where the Supreme Court upheld the use of hearsay evidence in the form of a statement by a co-conspirator not on trial made during the concealment phase of

the conspiracy. Distinguishing *Bruton* because the instant case did not involve evidence which was 'devastating' or 'a confession made in the coercive atmosphere of official interrogation,' the Court in *Dutton* held the admitted statement was 'sufficiently clothed with "indicia" of reliability' that it was properly 'placed before the jury though there is no confrontation with the declarant.' In short, the 'right of confrontation *** is not absolute.' " (Emphasis added.) 2 W. LaFave & J. Israel, Criminal Procedure §17.2, at 364 (1984).

For the reasons stated above, *Bruton* does not apply to the present case because codefendant Friday's statements were fully admissible under the coconspirator exception to the hearsay rule. (See *People v. Sanchez* (1989), 189 Ill. App. 3d 1011, 1017, 546 N.E.2d 268, 272.) Accordingly, this court should decline to discuss *Bruton* at all. I fear that the majority opinion's discussion of *Bruton* in a context in which that case does not apply might cause confusion among the bench and bar.

## II

The record shows that the trial court instructed the jury on first degree murder by giving the jury four separate sets of definitional and issues instructions, tracking thereby the four counts charging the defendant with first degree murder under sections 9—1(a)(1), (a)(2), and (a)(3), respectively, of the Code (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)). Count I charged first degree murder based on "intent to kill" (section 9—1(a)(1) of the Code); count II charged first degree murder based on "intent to do great bodily harm" (section 9—1(a)(1) of the Code); count III charged first degree murder based on knowledge "such acts create[d] a strong probability of death or great bodily harm" (section 9—1(a)(2) of the Code); and count IV charged first degree murder based on "felony murder" (section 9—1(a)(3) of the Code). The jury returned guilty verdicts of first degree murder as charged in counts I, II, and III. The trial court vacated convictions on the verdicts based upon counts II and III and ordered these vacated convictions held "in abeyance" pending appeal.

The procedure employed by the trial court to instruct the jury was error. Illinois Pattern Jury Instructions, Criminal, Nos. 7.01A and 7.02A (2d ed. Supp. 1989) (hereinafter IPI Criminal 2d) make clear that the jury should be instructed with only *one* definitional instruction and *one* issues instruction regarding that offense no matter how many counts of murder may be charged against a defendant. Two recent decisions of the Illinois Supreme Court support the instructional

scheme presently used in the IPI Criminal instructions regarding first degree murder. Those cases, *People v. Johnson* (1992), 149 Ill. 2d 118, 156-57, *People v. Scott* (1992), 148 Ill. 2d 479, 554-55, reemphasize that under Illinois law, there is only one offense of first degree murder, no matter how many different ways the State may choose to charge a defendant with that offense under section 9—1(a) of the Code.

IPI Criminal 2d Nos. 7.01A and 7.02A (Supp. 1989) provide for different language by which first degree murder may be charged, so there is no need for a trial court to provide separate definitional and issues instructions, as the court did in the present case. By doing so, the trial court unnecessarily risked confusing the jury and violated the mandate of Supreme Court Rule 451(a) (134 Ill. 2d R. 451(a)) that "the IPI Criminal instruction *shall be used*" unless the court determines that it does not accurately state the law. (Emphasis added.) No such determination of inaccuracy was made by the trial court in the present case, nor could such a determination be made; clearly IPI Criminal 2d Nos. 7.01A and 7.02A (Supp. 1989) accurately state the law. In the present case, the trial court deviated from the language of the IPI Criminal instructions apparently as a mere matter of preference. Doing so violates the mandate of Rule 451(a), and trial courts should refrain from such deviations in the future.