THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* CHARLES CARNIVALE *et al.,* Defendants-Appellees.

(Nos. 57677-85 cons.;

First District (3rd Division)—August 1, 1974.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis, John M. Cutrone, and Ricky Petrone, Assistant State's Attorneys, of counsel), for the People.

Sherman C. Magidson, of Chicago, for appellees.

Mr. PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

The State, pursuant to Supreme Court Rule 604(a)(1) (Ill. Rev. Stat. 1971, ch. 110A, par. 604(a)(1)), appeals from an order of the circuit court of Cook County sustaining defendants' pretrial motion to quash their arrests and suppress the evidence seized incident to those arrests. The arrests of the three defendants, Charles Pappas, Nicholas Pappas, and Charles Carnivale, occurred in the city of Rosemont, and resulted from the execution of search warrants directed against the latter two defendants by Chicago police officers. The arrest and search of Charles Pappas was not predicated upon the issuance of any warrant. Defendants were subsequently charged with the offenses of gambling, syndicated gambling, and being keeper of bets. The court found that no probable cause existed to justify the arrest of Charles Pappas, and that the Chicago police officers were not empowered by statute to execute the search warrants on the other two defendants outside the officers' territorial jurisdiction. The following facts were adduced at the hearing on defendants' motion.

Officer Nicolas Aron of the Chicago Police Department, the sole State's witness, testified that on July 21, 1971, he was armed with search warrants authorizing him to search the persons and automobiles of Carnivale and Nicholas Pappas, who were believed to be engaged in illegal gambling activities. The warrants had been issued to two police officers in the city of Chicago. On July 21, Aron observed Carnivale in an automobile turn off Harlem Avenue in the Village of Forest Park and enter the westbound lane leading to the Congress Expressway. Aron, dressed in plain clothes, followed him onto the expressway in an unmarked squad car.

Aron further testified that he attempted to overtake Carnivale on the expressway to execute the search warrant, but that he was unable to do so due to very heavy traffic and to the driving speed of Carnivale. Consequently, Aron and other Chicago police officers driving in a second unmarked squad car summoned by Aron were content to trail defendant on the expressway, and they followed him off the exit ramp at Mannheim Road. The witness stated that he again unsuccessfully attempted to overtake Carnivale during the approximately mile-and-a-half drive north on Mannheim Road to the Sheraton Motor Hotel. Officer Aron stated that he had observed Carnivale park his auto in the hotel parking lot and meet Nicholas Pappas in the same lot. The two men walked together to the hotel entrance, where they were joined by Charles Pappas. The three defendants then entered the hotel.

Officer Aron estimated that 1 or 2 minutes later he and three other Chicago police officers followed the defendants into the lobby. According to the witness, defendants were standing in the lobby about 25 yards away from the police officers near three to five public telephones. The police officers walked up to the men, executed the two search warrants, and arrested and searched Charles Pappas without a warrant. The searches yielded evidence the State intended to introduce at trial.

On cross-examination, the witness stated that he had recognized Carnivale in Forest Park when he was a half block behind Carnivale's auto. He was able to see that Carnivale was riding alone. Officer Aron was unable to recall the number or location of traffic lights and stop signs on Mannheim Road from Congress Expressway to the hotel entrance.

Carnivale testified at the hearing that he had taken the Northwest, not the Congress, Expressway to reach the hotel. He also testified that he had been in the hotel for at least an hour before his arrest and that he had eaten breakfast there.

Nicholas Pappas testified that he had been in the hotel for at least half an hour before the police entered and arrested him. He stated that when the police entered he was not standing near telephones, but was in the middle of the lobby looking at a demonstration. Carnivale was standing 10 feet away from him and his brother Charles was walking out the lobby door.

Charles Pappas testified that he had been in the hotel for at least half an hour before his arrest, and that he too had been in the coffee shop. He was arrested when he was exiting the hotel lobby.

At the conclusion of the testimony, the court sustained defendants' motion to quash the arrests and suppress the evidence seized "based on the law and all of the evidence." The court then granted the State's motion to strike the cause with leave to reinstate.

We shall consider initially that portion of the court's order quashing the warrantless arrest of Charles Pappas for lack of probable cause. The testimony on this issue is very brief. Officer Aron testified that he and other Chicago police officers followed Charles Pappas and the other two defendants into the hotel lobby within a couple of minutes of their entrance. He further stated that when he entered the lobby, he observed the three men standing approximately 25 yards away from them near three to five public telephones. The officer immediately walked up and arrested Charles Pappas. Although Charles Pappas denied the officer's account of the length of time from his entrance into the hotel to the time of his arrest and of his location in the hotel when arrested, it is clear

that Officer Aron's testimony even if true is totally insufficient to show probable cause justifying Charles Pappas' arrest.

■■ A police officer is justified in arresting a person without a warrant if he has reasonable grounds to believe the suspect is committing or has committed an offense. (Ill. Rev. Stat. 1971, ch. 38, par. 107—2(c).) The test of probable cause is whether a reasonable and prudent man in possession of the knowledge which has come to the arresting officer's attention would believe the person to be arrested is guilty of the crime. *People v. Harper* (1973), 16 Ill.App.3d 252, 305 N.E.2d 680.

■■ Not a shred of evidence was produced by the State indicating that there was a probability that Charles Pappas was committing or had committed a crime at the time of his arrest. Indeed one cannot even characterize the defendant's conduct as suspicious. The only facts, if believed, that the State could establish were that the accused was standing near two suspected gamblers, one his brother, in the vicinity of several public telephones. The court correctly ordered the arrest of Charles Pappas quashed and the fruits of the search suppressed.

The State's next contention is that the court erred in quashing the arrests of the other two defendants. It argues that the Chicago police officers were empowered to enter another municipality to execute these search warrants upon the authority of two statutes, which read as follows:

"The territory which is embraced within the corporate limits of adjoining municipalities within any county in this State shall be a police district." (Ill. Rev. Stat. 1971, ch. 24, par. 7—4—7.)

"The police of any municipality in such a police district may go into any part of the district to suppress a riot, to preserve the peace, and to protect the lives, rights, and property of citizens. For these purposes the mayor of any municipality in the district, and the chiefs of police therein, shall use the police forces under their control anywhere in the district." Ill. Rev. Stat. 1971, ch. 24, par. 7—4—8.

■■ Cities are creatures of the legislature, deriving their existence and powers therefrom. Consequently, statutes granting powers to municipal corporations shall be strictly construed. (*Barnard & Miller v. City of Chicago* (1925), 316 Ill. 519, 147 N.E. 384.) An inherent and implied limitation upon any city in the exercise of the powers delegated to it by the legislature is that such powers will be exercised within the corporate boundaries of the municipality. (*City of Rockford v. Hey* (1937), 366 Ill. 526, 9 N.E.2d 317.) A municipality will not possess extraterritorial jurisdiction, even with regard to its police powers, unless it is plain that such jurisdiction has been expressly or implicitly delegated to it by statute.

*City of Des Plaines v. Boeckenhauer* (1943), 383 Ill. 475, 50 N.E.2d 483; *City of Chicago v. Brent* (1934), 356 Ill. 40, 190 N.E. 97.

We take judicial notice that the cities of Chicago and Rosemont are on territory "embraced within the corporate limits of adjoining municipalities" in the County of Cook. Hence, in accordance with section 7—4—7 of the Illinois Municipal Code (Ill. Rev. Stat. 1971, ch. 24, par. 7—4—7), the cities are located in the same police district. We next must determine if any of the provisions of section 7—4—8 of the Illinois Municipal Code have been satisfied in the present case to justify the reach of the city of Chicago's police powers into the city of Rosemont.

The clear import of section 7—4—8 is to authorize in certain emergencies the police of one municipality to act in their official capacity in another municipality within the same police district. The provision carefully recites the specific types of occurrences which will trigger the extraterritorial police power of a municipality. However, the facts adduced at the present hearing do not remotely approach fulfillment of any of the conditions set out in that section of the statute. No testimony was offered suggesting that a "riot" was taking place in Rosemont, or that the "peace" of the city had been shattered, or that the accused had endangered any "lives," abridged any person's "rights," or disrupted, destroyed, or claimed any person's "property" in that city.

The State rests its total position on *People v. Harvey* (1964), 48 Ill. App.2d 261, 199 N.E.2d 236. In that case Chicago police officers arrested defendant for the burglary of a Chicago gas station and charged him with that crime. The officers proceeded later that same day to defendant's residence located in the village of Bridgeview, informed his wife of what had transpired, and requested permission to search the home for fruits of the crime. His wife gave her consent, and the search uncovered two checks taken in the burglary. This court found that the trial court had erred in suppressing the evidence obtained in the search, holding that the consent search by Chicago police officers in a different municipality in the same police district was authorized since it was "within their powers to seek and protect the property taken in the commission of a crime." ·

■■ Unlike the present case, *Harvey* satisfied one of the provisions of section 7—4—8, namely the need to protect the property of others. Defendant was believed to have committed a burglary. The proceeds of the crime were not found on his person. It was reasonable for the police to conclude that the stolen property might be concealed in defendant's home, and that it was necessary to quickly seize the property to prevent its destruction. Consequently, *Harvey* does not control the instant case. Therefore, it is eminently clear that the trial court properly held that section 7—4—8 had not been complied with so as to justify the extra-

territorial actions taken by the Chicago police officers against Carnivale and Nicholas Pappas.

In its brief the State notes in passing the possible applicability of the hot-pursuit doctrine in regard to Carnivale. Hot pursuit is defined as the immediate pursuit of a person who is endeavoring to avoid arrest. (Ill. Rev. Stat. 1971, ch. 38, par. 107—4(3).) In Illinois a statute provides that the issuance of a valid *arrest* warrant will justify any police officer in the state to execute that arrest warrant in any county of the State regardless of the existence of fresh pursuit. (Rev. Stat. 1874, ch. 38, par. 352, presently codified in Ill. Rev. Stat. 1971, ch. 38, par. 107—9(e).) The hot-pursuit doctrine is adhered to regarding a warrantless arrest situation involving different municipalities in this State. (*Kindred v. Stitt* (1869), 51 Ill. 401; *Taylor v. City of Berwyn* (1938), 297 Ill.App. 417, 17 N.E.2d 1007.) The hot-pursuit doctrine is also applicable to a police officer of another State entering the territorial boundaries of this State. Ill. Rev. Stat. 1971, ch. 38, par. 107—4(3)(b).

■■ No Illinois case has addressed itself to the question as to whether a police officer of one municipality in this State, upon a showing of hot pursuit, will be entitled to execute a search warrant directed against a fleeing suspect in a different municipality. However, we need not reach that issue. The record reveals that the trial judge did not believe that Carnivale was fleeing in an attempt to avoid the police or that Officer Aron was in immediate pursuit of Carnivale. We concur in both those beliefs. Carnivale was not speedily exiting the city limits of Chicago in hopes of reaching the safe confines of Rosemont. To the contrary, Officer Aron stated that he first observed Carnivale in his auto in the village of Forest Park. The officer did not even imply that he had pursued Carnivale out of Chicago. Moreover, there is no indication in the record that Carnivale had any knowledge that he was being followed by two unmarked police cars containing plainclothes officers, or that Carnivale attempted to avoid pursuit. The trial court was perfectly justified in finding that fresh pursuit of Carnivale did not exist.

For all the reasons stated, the order of the circuit court of Cook County quashing the defendants' arrests and suppressing the evidence seized incident to those arrests is affirmed.

Order affirmed.

DEMPSEY and McGLOON, JJ., concur.