THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NICHO-LAS VARGAS, Defendant-Appellant.

First District (4th Division)   No. 1—94—0647

Opinion filed December 21, 1995.

Rita A. Fry, Public Defender, of Chicago (Michael Davidson, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Andrea Bonin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE THEIS delivered the opinion of the court:

The defendant, Nicholas Vargas, appeals from a judgment entered on a jury verdict finding him guilty of delivery of a controlled substance. (Ill. Rev. Stat. 1991, ch. 56½, par. 1401(c)(2).) The questions presented on review are: (1) whether the trial court erred in denying the defendant's motion to quash his arrest and suppress evidence because Schaumburg police officers exceeded their authority by arresting him in Hoffman Estates (65 ILCS 5/7—4—8 (West 1992) (formerly Ill. Rev. Stat. 1991, ch. 24, par. 7—4—8)); (2) whether the trial court erred in denying the defendant's motion for a mistrial due to certain remarks made by venire members in the presence of jurors who ultimately served on the defendant's jury; (3) whether the court erred in failing to excuse a prospective juror for cause; (4) whether the court erroneously admitted evidence of other crimes; and (5) whether the defendant was denied a fair trial due to testimony about his tattoos and a question concerning a witness' club or organization affiliation. We conclude that the court's denial of the defendant's motion to quash arrest and suppress evidence was not manifestly erroneous. We further determine that the defendant failed to show prejudice with respect to comments made by prospective jurors and that the court properly refused to excuse a juror for cause. Further, the defendant waived the issue of whether the State improperly elicited testimony regarding other crimes which did not expressly implicate the defendant. Finally, testimony regarding tattoos and the State's question about club membership did not prejudice the defendant so as to deny him a fair trial. Therefore, the defendant's conviction is affirmed.

Prior to trial, the defendant filed a motion to quash his arrest and suppress evidence obtained during his arrest, charging that Schaumburg police officers did not have the authority to arrest him in Hoffman Estates. The defendant did not offer any testimony or evidence at the hearing. The court denied the motion, finding that section 7—4—8 of the Illinois Municipal Code (65 ILCS 5/7—4—8 (West 1992)) authorized the Schaumburg police to arrest the defendant in Hoffman Estates.

At trial, Officer Craig Modjeski of the Schaumburg police department testified on behalf of the State. He explained that on December 7, 1990, he and Detective Patrick White were working on an undercover narcotics sting operation. Modjeski stated that he contacted David Bernal using an undercover telephone at the Schaumburg police station. He agreed to meet Bernal at Chili's restaurant at 6 p.m. in Hoffman Estates to purchase a half ounce of cocaine from him for $650. He further stated that Bernal selected the meeting site.

At approximately 5 p.m. the officers held a meeting at the Schaumburg police department concerning the operation. Two Hoffman Estates police officers attended the meeting. Modjeski testified that when a drug deal is arranged to take place in another city or village, the Schaumburg police department contacts the other municipality and has them come along.

Modjeski testified that he arrived at Chili's at 6 p.m. and that surveillance units were in place both inside and outside of the restaurant. Modjeski stated that upon entering Chili's he took a seat in a booth behind his inside surveillance. After approximately 50 minutes David Bernal and the defendant entered the restaurant. Bernal sat down at the booth with Modjeski, but the defendant sat down at an adjacent table. Modjeski testified that both Bernal and the defendant were approximately three to four feet away from him.

Modjeski further explained that Bernal introduced the defendant, referring to him as "his partner, Little Man," and that the defendant shook his hand and smiled. When Modjeski asked Bernal whether the defendant was carrying a gun, he stated, "Well, he is my backup." Modjeski testified that when Bernal made this statement, the defendant looked at him and smiled. Modjeski and Bernal then discussed the drug transaction using a normal tone of voice. They eventually agreed to proceed with the transaction in Modjeski's car.

Modjeski testified that when they arrived at his car, Bernal told the defendant to "do" Modjeski if he did anything stupid. Modjeski stated that the defendant looked at him and smiled when Bernal made this statement. Then, they all entered the car where Bernal

gave Modjeski a package containing a white powdery substance. Modjeski testified that when he retrieved an electronic scale from the glove compartment, the defendant offered to buy it from him. Modjeski informed the defendant that the scale was not for sale and handed Bernal $650. Modjeski further testified that the defendant, who was seated in the middle of the back seat, was looking over into the front seat during the transaction. Modjeski then signaled to the surveillance officers to proceed with the arrests and left the car.

The parties stipulated that Deborah Magolan, a forensic scientist for the Illinois State Police, tested and analyzed the content of the package obtained from Bernal and found it to be 14.6 grams of a substance containing cocaine. The State then rested and the judge denied the defendant's motion for a directed verdict.

The defendant called David Bernal to testify on his behalf. Bernal stated that he had known the defendant for 12 years. He further stated that in December of 1990, he saw the defendant walking along the road when he was on his way to Chili's to deliver drugs to Modjeski. He testified that he picked the defendant up because he appeared to be drunk. He then continued to Chili's. Bernal further stated that he never asked the defendant to be his bodyguard or lookout. He also claimed that he did not tell the defendant that he was going to Chili's to deliver cocaine.

Bernal testified that he entered the restaurant and sat down at a booth with Officer Modjeski. He explained that the defendant sat at a table approximately 20 feet away from them. Bernal testified that after they left Chili's, Modjeski had to ask the defendant twice to climb into his car before he finally complied. Bernal also testified that he pleaded guilty to delivery of a controlled substance and was sentenced to four years in prison.

On cross-examination, Bernal testified that the defendant is his ex-wife's brother. He further stated that the defendant lived about 10 minutes from where Bernal picked him up before going to meet Modjeski. Bernal admitted that he told Modjeski that the defendant was called Little Man and that he was his brother-in-law. He also admitted that he told Modjeski that the defendant was his backup. Bernal further testified that he told the defendant to "do" Modjeski if he did anything stupid. He claimed that he, not the defendant, asked to purchase the scale.

On cross-examination, Bernal admitted that he had been selling narcotics for about six months prior to the December arrest, but claimed that he did not tell the defendant about his involvement with drugs. Bernal conceded that he waited until two days after his arrest before telling Officer Modjeski that the defendant was not involved in the December 7 drug transaction.

In response to the State's questions, Bernal indicated that he had several tattoos. The State then asked Bernal whether he belonged to any clubs or organizations. The court sustained the defendant's objection to this question and Bernal did not respond. The State further questioned Bernal about whether the defendant had any tattoos. Over the defendant's objection, Bernal testified that the defendant had a couple of tattoos, but that the defendant's differed from his. The defendant then moved for a mistrial, arguing that the State improperly interjected the issue of gangs into the trial. The court denied the motion.

In rebuttal, the State called Officer Serio, who testified that he observed the defendant entering and exiting Chili's restaurant. He testified that he did not see the defendant staggering or stumbling, nor did he observe anything unusual about the manner in which the defendant walked.

The State then recalled Officer Modjeski, who testified that on November 30, 1990, he conducted a separate drug transaction with Bernal. Modjeski further stated that Bernal told him that he had to hurry because his brother-in-law was out in the car covering him. The defendant did not raise an objection to this question.

Modjeski testified that the defendant did not appear to be intoxicated at the time of the December 7 drug transaction. Finally, he testified that Bernal never told him that the defendant had nothing to do with the drug transaction. On cross-examination, Modjeski stated that he did not see the defendant on November 30, 1990. Both sides rested.

Prior to closing arguments, the court instructed the jury to disregard any evidence or inferences concerning tattoos. The jury subsequently found the defendant guilty of delivery of a controlled substance. The court denied the defendant's motion for a new trial. The court then sentenced the defendant to five years in prison. The defendant now appeals.

First, we consider the trial court's decision to deny the defendant's motion to quash arrest and suppress evidence, which we will not disturb unless it is manifestly erroneous. (*People v. Foskey* (1990), 136 Ill. 2d 66, 76, 554 N.E.2d 192, 197.) On a motion to quash arrest and suppress evidence, the burden of proof rests on the defendant.

The defendant claims that the trial court erred in finding that the Schaumburg police officers had the authority to arrest him in Hoffman Estates pursuant to section 7—4—8 of the Illinois Municipal Code (Code). The defendant claims that because the Schaumburg officers were not responding to an emergency situation, their official presence in Hoffman Estates and the defendant's arrest were unau-

thorized. In response, the State maintains that sections 7—4—7 and 7—4—8 permit an officer from one municipality to act in his official capacity in a bordering municipality.

Section 7—4—8 of the Code provides:

> "The police of any municipality in such a police district may go into any part of the district to suppress a riot, to preserve the peace, and to protect the lives, rights, and property of citizens. For these purposes the mayor of any municipality in the district, and the chiefs of police therein, shall use the police forces under their control anywhere in the district." (65 ILCS 5/7—4—8 (West 1992).)

Section 7—4—7 of the Code provides:

> "The territory which is embraced within the corporate limits of adjoining municipalities within any county in this State shall be a police district." 65 ILCS 5/7—4—7 (West 1992).

In the present case, the parties stipulated that Schaumburg and Hoffman Estates are adjoining municipalities and that the arrest occurred in Hoffman Estates. However, the parties did not stipulate to the identity of the arresting officer. Further, the defendant failed to offer any testimony or evidence concerning the circumstances of the arrest. On appeal, the parties do not dispute the issue of whether a Schaumburg officer arrested the defendant. We note, however, that this evidence was not presented to the trial court at the hearing on the defendant's motion.

At common law, police officers had no power to make warrantless arrests outside of the jurisdiction where they had been appointed. (*People v. Stanley* (1994), 264 Ill. App. 3d 94, 637 N.E.2d 1072; *People v. Marino* (1980), 80 Ill. App. 3d 657, 400 N.E.2d 491.) A well-established exception permitted officers in fresh pursuit of a fleeing felon to execute a lawful arrest outside of their jurisdiction. *Stanley*, 264 Ill. App. 3d at 95, 637 N.E.2d at 1073.

■ The common law rule concerning warrantless interterritorial arrests has been modified in part by sections 7—4—7 and 7—4—8 to allow officers to make arrests in adjoining municipalities to suppress a riot, to preserve the peace, and to protect the lives, rights, and property of citizens. (*Stanley*, 264 Ill. App. 3d at 95, 637 N.E.2d at 1073; *People v. Gutt* (1994), 267 Ill. App. 3d 95, 640 N.E.2d 1013; *People v. DeBlieck* (1989), 181 Ill. App. 3d 600, 537 N.E.2d 388.) However, Illinois case law limits "the scope of section 7—4—8 to the arrest of persons who are dangerous enough to the public to require emergency action." (*Stanley*, 264 Ill. App. 3d at 95-96, 637 N.E.2d at 1073; see also *People v. Carnivale* (1974), 21 Ill. App. 3d 780, 315 N.E.2d 609, *aff'd in part & rev'd in part* (1975), 61 Ill. 2d 57, 329 N.E.2d 193 (section 7—4—8 allows police officers from one municipal-

ity to act in their official capacity in another municipality in certain emergencies).) Circumstances in which courts have found the need for emergency action within the purview of section 7—4—8 include the arrest of an intoxicated driver (*People v. Bains* (1987), 152 Ill. App. 3d 951, 505 N.E.2d 13) and the arrest of an intoxicated individual with a gun (*People v. Lawson* (1976), 36 Ill. App. 3d 767, 345 N.E.2d 41).

■ Unlike the situations in *Bains* and *Lawson*, the Schaumburg police in this case were not responding to an emergency situation when they arrested the defendant. Rather, the circumstances which led to the defendant's arrest were orchestrated by the police. Because the circumstances contemplated by section 7—4—8 were not present here, we conclude that the Schaumburg officer who arrested the defendant did not derive his authority to do so from section 7—4—8. However, our analysis of the propriety of the court's ruling denying the defendant's motion does not end here.

Sections 7—4—7 and 7—4—8 "mandate the cooperation of adjoining municipalities within a county to promote cohesive law enforcement in emergency situations regardless of whether interjurisdictional agreements for this purpose exist." (*People v. O'Connor* (1988), 167 Ill. App. 3d 42, 44-45, 520 N.E.2d 1081, 1083.) As such, these provisions should not be read to discourage cooperation between police departments from adjoining municipalities, especially if there is an apparent agreement between departments.

The defendant concedes and the record shows that Hoffman Estates police officers were present at a meeting at the Schaumburg police department at 5 p.m. on December 7, 1990, approximately two hours prior to the defendant's arrest. The meeting concerned the undercover operation that the Schaumburg police had planned. At trial, Officer Modjeski gave the following testimony in reference to the meeting:

"Q. Well, from [*sic*] what other departments were there that were involved in this investigation?

A. There were two officers from the Hoffman Estates Police Department.

Q. Was there a reason why you had Hoffman Estates police officers present at this meeting?

A. We try and—Whenever we are going to work a deal outside of our village, we contact the village or the city that we are going to be working and have them come along for numerous reasons."

■ Based on the record, we conclude that the Hoffman Estates and Schaumburg police officers engaged in a cooperative effort to carry out the sting operation which led to the defendant's arrest. We

note that Modjeski's testimony on this issue remains unrebutted. In the absence of evidence to the contrary, we determine that the Schaumburg officers had the authority to arrest the defendant.

Our conclusion is supported in part by section 11—1—2.1 of the Illinois Municipal Code, which provides in relevant part:

"In addition to the powers of the police of any municipality under Section 7—4—8 of this Act, the corporate authorities of each municipality having a population of less than 500,000 may enter into agreements with any other such municipality or municipalities to furnish police assistance on request." 65 ILCS 5/11—1—2.1 (West 1992).

The General Assembly clearly permits agreements between municipalities concerning the sharing of police assistance. More importantly, section 11—1—2.1 evidences a public policy of encouraging municipalities to agree to assist one another in carrying out law enforcement objectives. In this case, the Schaumburg police department had been conducting an ongoing investigation of Bernal, and Modjeski had established a relationship with Bernal. As a practical matter, it would have been imprudent for the Schaumburg police department to abandon their efforts when Bernal decided that the exchange between him and Modjeski would occur in Hoffman Estates. Instead, the Schaumburg police department contacted Hoffman Estates law enforcement officers, but continued to lead the investigation.

Here, the record does not show whether Schaumburg and Hoffman Estates have populations of less than 500,000. However, the defendant has failed to offer any evidence to show that the Schaumburg police did not have the authority to arrest him and, therefore, failed to meet his burden. (Compare *People v. DeBlieck* (1989), 181 Ill. App. 3d 600, 537 N.E.2d 388 (under statute authorizing the sheriff to enlist the assistance of others when necessary, a summoned officer from another jurisdiction may exercise the same powers as the sheriff).) Therefore, we conclude that the trial court's decision denying the defendant's motion to quash his arrest and suppress evidence was not manifestly erroneous. Because we determine that the defendant failed to meet his burden, we decline to consider the issue of whether the defendant's arrest constituted a private citizen's arrest under section 107—3 of the Code of Criminal Procedure of 1963. 725 ILCS 5/107—3 (West 1992).

The next question that we are asked to decide is whether the trial court abused its discretion in denying the defendant's motion for a mistrial. Specifically, prospective juror Daleccio commented on the defendant's tattoos and ponytail, stating that he resembled an in-

dividual who had stabbed him in the past. Both Daleccio and prospective juror Martinez stated that the defendant looked guilty. Finally, prospective juror Jones stated that it seemed that the defendant "got caught with his hand in the cookie jar." The court excused all three prospective jurors.

Simply stated, a fair trial requires impartial jurors. (*People v. Jones* (1985), 105 Ill. 2d 342, 475 N.E.2d 832.) In order for this court to reverse the defendant's conviction, it reasonably must appear that the jurors have been influenced to such a degree that they cannot be fair or impartial. (*People v. Malmenato* (1958), 14 Ill. 2d 52, 150 N.E.2d 806; *People v. Rogers* (1985), 135 Ill. App. 3d 608, 482 N.E.2d 639.) The answer to the question of whether prejudicial influence exists must be determined based on the facts and circumstances of the case. *Malmenato*, 14 Ill. 2d at 63, 150 N.E.2d at 812.

■ Turning to the case at bar, we first note that the court excused the three jurors who indicated that they harbored biases against the defendant. Further, we note that none of the jurors who ultimately served on the defendant's jury commented negatively on his appearance.

The only case cited by the defendant on this issue involves a trial court's erroneous decision that jurors were not influenced by a newspaper article. (*Rogers*, 135 Ill. App. 3d 608, 482 N.E.2d 639.) The court explained that the determination of prejudice rests on the nature of the prejudicial material and all of the facts and circumstances in the record, as well as the jurors' own statements. *Rogers*, 135 Ill. App. 3d 608, 482 N.E.2d 639.

The court in *Rogers* ultimately ordered a new trial in part because a newspaper article read by a juror contained information concerning details of the defendant's prior arrest for rape and indicated that he was released from prison the day before he committed the crime charged. Here, none of the jurors were exposed to information about the defendant. The remarks made by prospective jurors merely reflected their opinions based solely upon the defendant's appearance and not any factual information which could be construed as prejudicial. Therefore, the trial court did not abuse its discretion in denying the defendant's motion for a new trial on this issue. *People v. Mehlberg* (1993), 249 Ill. App. 3d 499, 618 N.E.2d 1168 (defendant not entitled to a mistrial when a prospective juror commented that the probation office where she worked had files on the defendant).

The defendant's third contention on appeal is that the trial court erred in refusing to excuse prospective juror Robert Atkins because he allegedly equivocated about his ability to decide the case on its

facts. The record shows that a lengthy exchange took place between Atkins, the court and defense counsel in which Atkins stated that he opposed drugs. Atkins also indicated that his brother is a Chicago police officer. He further explained that recently he had broken his tailbone and that he experienced discomfort from sitting for extended periods of time. Finally, the following exchange took place:

"THE COURT: "All I want to know is can you or can you not be fair to both sides?"

MR. ATKINS: Yeah. I could be fair."

The defendant subsequently asked the court to strike Atkins for cause and the court refused, finding that Atkins did not pose a "for cause" situation. The court acknowledged that Atkins had a strong opinion about drugs, but stated that the determinative issue was whether Atkins could be fair. The defendant then exercised a peremptory challenge to excuse Atkins.

Later in the *voir dire* proceedings, the court refused the defendant's request for an additional peremptory challenge to excuse juror Kevin Valentine, a police officer who ultimately served on the defendant's jury. Valentine expressly stated more than once that he could be fair. The defendant now claims the court's failure to excuse Atkins adversely affected the makeup of his jury thereby requiring a reversal.

Here, the defendant has the burden of showing the actual existence of a prospective juror's disqualifying state of mind which will raise the presumption of impartiality. (*People v. Johnson* (1992), 149 Ill. 2d 118, 594 N.E.2d 253; *People v. Cole* (1973), 54 Ill. 2d 401, 298 N.E.2d 705.) A trial court's decision not to excuse a juror for cause will not be disturbed unless it is against the manifest weight of the evidence. (*People v. Johnson* (1991), 215 Ill. App. 3d 713, 575 N.E.2d 1247.) Where a challenged venire member does not sit as a juror, a defendant may claim prejudice if he or she was forced to accept an objectionable juror because his or her peremptory challenges had been exhausted. *Johnson*, 215 Ill. App. 3d 713, 575 N.E.2d 1247.

■ In this case, Atkins unequivocally stated that he could be fair. Also, although Atkins indicated that he is related to a police officer, this is not enough to show that he was not capable of being impartial. (See *People v. Reinbold* (1993), 247 Ill. App. 3d 498, 617 N.E.2d 436.) While Atkins stated that he disapproved of drugs, he did not say that this would sway his judgment in favor of the prosecution. We find that the court's decision not to excuse Atkins for cause was not against the manifest weight of the evidence given the totality of Atkins' *voir dire* testimony.

■ The defendant further contends on appeal that he deserves a

new trial because the State improperly elicited testimony from Modjeski about another drug offense involving Bernal which allegedly implicated the defendant. Specifically, Modjeski stated that during the drug transaction on November 30, 1990, Bernal told him that they had to hurry up and that he had his brother-in-law out in the car covering him. The defendant did not object to this question or testimony. Finally, during closing arguments the State referred to the November 30 drug deal when discussing Bernal's testimony. However, the State did not implicate the defendant at this point and the defendant did not object to this line of argument. Moreover, the defendant has waived this issue because he failed to object at trial. *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130.

The defendant's final argument on appeal is that he was denied a fair trial because the State improperly elicited testimony concerning tattoos and organization membership, which implicitly linked him to street gangs. The court denied the defendant's motion for a mistrial because it sustained the defendant's objection to the State's question concerning Bernal's club membership. The court further reasoned that Bernal testified that the defendant's tattoos differed from his own, thereby defeating the State's theory that similar tattoos would have shown a connection between Bernal and the defendant. Also, the court admonished the jury to disregard any inferences from evidence concerning tattoos.

■ We find the defendant's argument to be without merit. Bernal never testified concerning gangs and the court sustained the defendant's objection to the State's question about whether Bernal belonged to an organization. The case cited by the defendant concerning the relevance of gang membership addresses situations in which a jury is told about a defendant's membership in a particular gang. (See *People v. Lucas* (1992), 151 Ill. 2d 461, 603 N.E.2d 460.) In this case, the jury heard no evidence concerning the defendant's membership in a particular street gang. Finally, the court's instruction to the jury to disregard testimony about tattoos provided a safeguard against any possible inferences concerning gangs that the jury might have gleaned from Bernal's testimony.

For the reasons set forth above, we affirm the defendant's conviction and sentence.

Affirmed.

HOFFMAN, P.J., and S. O'BRIEN, J., concur.